IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

────────────────────────────

JAY H. MORSE,

                        Plaintiff,

           v.

RONALD MALLERNEE and
DOUGLAS SPRINGER,

                  Defendants.

Civil Action No.
9:13-CV-1354 (LEK/DEP)

────────────────────────────

APPEARANCES:                     OF COUNSEL:

FOR PLAINTIFF:

JAY H. MORSE, *Pro Se*
12-B-1199
Riverview Correctional Facility
P.O. Box 247
Ogdensburg, NY 13669

FOR DEFENDANT MALLERNEE:

HON. ERIC T. SCHNEIDERMAN     MICHAEL G. McCARTIN, ESQ.
New York State Attorney General     MARK G. MITCHELL, ESQ.
State of New York                      Assistant Attorneys General
The Capitol
Albany, NY 12224

FOR DEFENDANT SPRINGER:

HON. ROBERT G. BEHNKE        LEIA D. SCHMIDT, ESQ.
Broome County Attorney         Assistant County Attorney
Edwin L. Crawford County Office Bldg.
P.O. Box 1766
Binghamton, NY 13902

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Jay H. Morse, a New York State prison inmate, has commenced this action against Douglas Springer, a Broome County Deputy Sheriff, and Ronald Mallernee, a corrections officer employed by the New York State Department of Corrections and Community Supervision ("DOCCS") pursuant to 42 U.S.C. § 1983 alleging that his rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* were violated when his necklace displaying a crucifix was forcibly removed from his neck and confiscated during the course of a transfer from local to state custody.

Currently pending before the court are defendants' separately filed motions seeking dismissal of plaintiff's complaint pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that both of the pending motions be denied.

I.    <u>BACKGROUND</u>[1]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 10. While he is now incarcerated at the Riverview Correctional Facility, at the times relevant to his claims in this action, plaintiff was being transferred from the Broome County Correctional Facility ("BCCF") to the Elmira Reception Center ("Elmira R.C."), a DOCCS facility. *Id.* at 2, 3.

On April 23, 2012, while plaintiff was being prepared for transfer from the BCCF to the Elmira R.C., defendant Springer told plaintiff he could not possess the one-and-one-half inch silver crucifix displayed on a twenty-four inch silver chain worn around his neck. Dkt. No. 10 at 3. After objecting and informing defendant Springer that DOOCS Directives #4202 and #4911 permitted him to wear the necklace, plaintiff and defendant Springer discussed the matter with an unidentified Broome County Sheriff's Sergeant, who confirmed that plaintiff was permitted to wear it. *Id.*

---

[1]    In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's second amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964).

Defendant Springer and another unidentified Broome County Deputy Sheriff then transported plaintiff to the Elmira R.C. *Id.*

Upon arriving at Elmira R.C., defendant Springer informed defendant Mallernee that plaintiff was wearing a necklace, and defendant Mallernee instructed defendant Springer to confiscate it. Dkt. No. 10 at 3. Notwithstanding plaintiff's objections, defendant Springer "forcibly yanked" the necklace with the crucifix from plaintiff's neck and threatened to "throw [it] out the window while returning to Binghamton." *Id.* at 3-4.

Plaintiff alleges that he "is a practicing Roman Catholic and [holds the crucifix confiscated by defendant Springer] while reciting his prayers twice a day" and that doing so allows him to feel "closer to God[.]"[2] Dkt. No. 10 at 11.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on October 31, 2013, with the filing of a complaint and an accompanying application for leave to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Plaintiff's original complaint named eight individuals as defendants, including several DOCCS employees, the Broome County Clerk, and members of the Broome County Sheriff's

_____

[2]    Plaintiff also alleges that the crucifix, which he describes as a "cherished family heirloom," was given to him by his mother shortly before she died. Dkt. No. 10 at 4, 11, 12.

Department. Dkt. No. 1 at 2. On January 6, 2014, Senior District Judge Lawrence E. Kahn issued a decision and order, pursuant to 28 U.S.C. §§ 1915(e), 1915A, granting plaintiff's IFP application and dismissing plaintiff's complaint, with leave to amend, for failing to state a claim upon which relief may be granted. Dkt. No. 6. Plaintiff availed himself of the opportunity to amend, filing an amended complaint on January 21, 2014. Dkt. No. 7. By decision and order dated July 8, 2014, Judge Kahn dismissed all of the claims asserted in plaintiff's amended complaint, with the exception of the First Amendment and RLUIPA claims asserted against defendants Springer and Mallernee. Dkt. No. 9. Judge Kahn also directed the clerk of the court to docket a copy of the original complaint, together with the amended complaint, as plaintiff's "second amended complaint," which is now the operative pleading. *Id.* at 4 n.7.

Following service of the summons and second amended complaint upon the defendants, both defendant Springer and defendant Mallernee filed the currently pending motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. Nos. 27, 36. Both defendants contend that dismissal is appropriate because they are entitled to qualified immunity from suit, and defendant Springer additionally seeks dismissal based on the absence of any allegations that plausibly suggest plaintiff's

right to free exercise of religion was substantially burdened. *See generally*

Dkt. Nos. 27-1, 36-1. Plaintiff has responded to defendants' motions, and

both defendants have since submitted replies in further support of their

motions. Dkt. Nos. 30, 33, 39, 40. The motions, which are now fully

briefed, have been referred to me for the issuance of a report and

recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern

District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Legal Standard Governing Motions to Dismiss Pursuant to
           Rule 12(b)(6) of the Federal Rules of Civil Procedure

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure, calls upon a court to gauge the

facial sufficiency of that pleading using a standard which, though

unexacting in its requirements, "demands more than an unadorned, the-

defendant-unlawfully-harmed me accusation" in order to withstand

scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp.

v. Twombly*, 550 U.S. 554, 555 (2007)). Under Rule 8(a)(2) of the Federal

Rules of Civil Procedure, "a pleading must contain a 'short and plain

statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*,

556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)). While modest in its

requirements, that rule commands that a complaint contain more than

mere legal conclusions. *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The tenet that a court must accept as true all of the allegations contained in a complaint does not apply, however, to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting

*Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

### B. Plaintiff's First Amendment Claim

Defendant Springer contends that plaintiff's First Amendment free exercise claim should be dismissed because the allegations in the second amended complaint fail to plausibly allege that plaintiff's right to the free

exercise of his religion was not substantially burdened by defendants' alleged conduct.[3] Dkt. No. 36-1 at 5-7.

While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection. *Pell v. Procunier*, 417 U.S. 816, 822 (1974). Whatever protections an inmate retains, however, are not without limits, and the task of defining the contours of the rights in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348-49 (1987); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990).

As a threshold matter, "[t]he prisoner must show . . . that the disputed conduct substantially burdens his sincerely held religious beliefs."[4] *Salahuddin*, 467 F.3d at 274-75. In evaluating this factor, the

---

[3]     Neither defendant Springer nor defendant Mallernee seeks dismissal of plaintiff's RLUIPA claim. *See generally* Dkt. Nos. 27-1, 36-1.

[4]     The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith*, 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the

court must be wary of "'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" *McEachin*, 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin*, 467 at 275. "[T]he burden[, however,] remains with the prisoner to 'show that these penological concerns were irrational.'" *Ford*, 352 F.3d at 595 (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

In the event the defendants identify a legitimate penological interest justifying their actions allegedly depriving the plaintiff of his free exercise rights, the court must consider whether the defendants' conduct is reasonably related to that penological interest. *Ford*, 352 F.3d at 594; *see*

---

unacceptable business of evaluating the relative merits of differing religious claims.'" *Ford*, 352 F.3d at 592 (quoting *Emp't Div.*, 494 U.S. at 887); *see also Holland*, 758 F.3d at 220-21 (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

*also Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) ("Even if Defendants-Appellees substantially burdened [the Plaintiff-Appellant]'s sincerely held religious believes, their actions do not constitute a constitutional deprivation if they were reasonably related to legitimate penological interests." (quotation marks omitted)). The question of whether a challenged regulation or decision by prison officials is reasonable is informed by the following four factors:

> [(1)] [W]hether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; [(2)] whether prisoners have alternative means of exercising a burdened right; [(3)] the impact on the guards, inmates, and prison resources of accommodating the right; and [(4)] the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Salahuddin*, 467 F.3d at 274 (footnote omitted).[5]

In this case, plaintiff alleges that (1) he is Roman Catholic, (2) he prayed twice daily with the crucifix that defendants confiscated, (3) holding the crucifix during prayer brought him closer to his god, and (4) DOCCS regulations permitted him to wear his crucifix. *See generally* Dkt. No. 10. Liberally construed, these allegations are sufficient to plausibly allege that

---

[5] The Second Circuit has held that "[a]n individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same ways as a prison regulation denying such exercise." *Salahuddin*, 467 F.3d at 274 n.4.

the confiscation of plaintiff's crucifix substantially burdened his sincerely held religious beliefs. *See, e.g., Malik v. City of N.Y.*, No. 11-CV-6062, 2012 WL 3345317, at *12 (S.D.N.Y. Aug. 15, 2012) ("[The plaintiff's] allegations that he practices Islam and that [the defendants] ripped up and destroyed his sacred Quran states a legally sufficient claim under both the Free Exercise Clause and the RLUIPA."); *Morris v. Woodford*, No. 08-CV-3435, 2009 WL 3925267, at *2 (N.D. Cal. Nov. 18, 2009) ("[Plaintiff] has stated a cognizable claim under the First Amendment and under RLUIPA based on the denial and confiscation of his Quran and other Islamic study and prayer materials."); *Shaw v. Norman*, No. 07-CV-0443, 2008 WL 1912910, at *3 (E.D. Tex. Apr. 28, 2008) (finding, for purposes of 28 U.S.C. § 1915A, the plaintiff had stated a plausible First Amendment and RLUIPA claim by alleging that the defendants confiscated and destroyed some of his religious property, including his Quran, prayer rug, and prayer beads, and that "his only comfort in prison [was] his religion"); *cf. Singh v. Goord*, 520 F. Supp. 2d 487, 504 (S.D.N.Y. 2007) (finding that a genuine dispute of material fact exists for trial with respect to whether the defendants substantially burdened the plaintiff's right to exercise his religion by forbidding him from wearing a Khanda, which is a Sikh religious

pendant worn around the neck).[6]

Because there are no allegations in plaintiff's second amended complaint regarding whether defendants' conduct was in furtherance of or otherwise related to a legitimate penological interest, I recommend defendant Springer's motion be denied to the extent it requests dismissal on the basis that the second amended complaint fails to state a First Amendment free exercise claim.[7] In the event the defendants articulate a legitimate penological interest supporting their actions, the plaintiff's claim can then be analyzed in accordance with the foregoing test based upon a more complete record, either on a motion for summary judgment or at trial.

---

[6]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

[7]     Even assuming defendant Springer sought dismissal of plaintiff's RLUIPA claim, it would not be subject to dismissal at this time for the same reasons plaintiff's First Amendment free exercise claim survives. Although the legal standards governing the two claims differ with respect to the degree with which the defendants' conduct must be related to a legitimate penological interest, both causes of action require that a plaintiff prove his right to practice a sincerely held religious belief was substantially burdened. *See* 42 U.S.C. § 2000cc(a)(1) ("No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person. . . unless the government demonstrates that imposition of the burden on that person. . . is in furtherance of a compelling governmental interest; and [] is the least restrictive means fo furthering that compelling governmental interest.").

C.    Qualified Immunity

Both defendants Springer and Mallernee seek dismissal of plaintiff's claims asserted against them, arguing that, even assuming the facts alleged in plaintiff's second amended complaint are true, they are entitled to qualified immunity from suit. Dkt. No. 27-1 at 5-8; Dkt. No. 36-1 at 7-10.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a

mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985),

the Supreme Court has "repeatedly . . . stressed the importance of

resolving immunity questions at the earliest possible stage in the

litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S.

224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from

suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d

Cir. 2011). Specifically, the inquiry turns on whether the facts alleged,

taken in a light most favorable to the plaintiff, show that the conduct at

issue violated a statutory or constitutional right, and if so, whether that

right "was clearly established at the time of the challenged conduct."

*Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132

S. Ct. at 2093). The Supreme Court has said that an officer's "conduct

violates clearly established law when, at the time of the challenged

conduct, the contours of a right are sufficiently clear that every reasonable

official would have understood that what he is doing violates that right."

*Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and

alterations omitted). "To this end, a plaintiff need not show a case 'directly

on point, but existing precedent must have placed the statutory or

constitutional question beyond debate.'" *Terebesi*, 764 F.3d at 230

(quoting *al-Kidd*, 131 S. Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Defendants in this case contend that they are entitled to qualified immunity because "there is not a clearly established right to possess a crucifix while incarcerated[.]" Dkt. No. 36-1 at 9; *see also* Dkt. No. 27-1 at 7 ("[T]here is no case law that *requires* that an inmate be allowed to wear a crucifix while he is imprisoned." (emphasis in original)). While it is true that the precise issue of whether an inmate is permitted to wear a one-and-one-half inch crucifix around his neck has not been decided by either the Supreme Court of the United States or the Second Circuit Court of Appeals, that does not necessarily preclude a finding that it is clearly established law. *See Shabazz v. Coughlin*, 852 F.2d 697, 701 (2d Cir. 1988) ("Of course, under certain circumstances, the absence of specific

authority on point will not preclude a finding that the law was clearly established."). Even where the Second Circuit has not explicitly held that a course of conduct is unconstitutional, courts "may nonetheless treat the law as clearly established if decisions from this or other circuits clearly foreshadow a particular ruling on the issue." *Terebisi*, 764 F.3d at 231 (quotation marks omitted); *see also al-Kidd*, 131 S. Ct. at 2084 (finding that, in the absence of controlling authority, "a robust 'consensus of cases of persuasive authority'" is required in order to find that a defendant is not entitled to qualified immunity (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).

In this case, with respect to the particular right at issue, I find that, assuming the facts as alleged in the second amended complaint are true, there is sufficient legal precedent that should have put defendants on notice that an inmate has a constitutional right to wear a crucifix where it is not contrary to or inconsistent with a legitimate penological interest.[8] *See O'Lone*, 482 U.S. at 348-49 (holding that limiting an inmate's First Amendment rights is valid if reasonably related to legitimate penological

---

[8]     In this regard, plaintiff's second amended complaint contains no allegations that either of the defendants sought to, or did, confiscate plaintiff's crucifix in light of or in furtherance of a legitimate penological interest. *See generally* Dkt. No. 10. In the absence of this allegation, and mindful of the court's obligation to liberally construe a *pro se* litigant's pleadings, I have assumed, for purposes of the pending motions, that defendants Springer and Mallernee confiscated plaintiff's necklace for no reason.

interests). In his opinion in *Hudson v. Palmer*, Justice Stevens said that "[a] prisoner's possession of . . . personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free Exercise Clause of the First Amendment." *Hudson v. Palmer*, 468 U.S. 517, 547 n.13 (1984) (Stevens, J., concurring in part and dissenting in part). Courts have relied on this portion of Justice Stevens' opinion to find that, for example, allegations of a defendant's destruction of an inmate-plaintiff's Quran states a legally sufficient claim under both the First Amendment and the RLUIPA. *Malik*, 2012 WL 3345317, at *12; *see also Hanas v. Inner City Christian Outreach, Inc.*, 542 F. Supp. 2d 683, 695 (E.D. Mich. 2008) (granting summary judgment in favor of the plaintiff where the defendant confiscated the plaintiff's rosary book and prayer book and the defendants could not "reasonably argue that [the confiscation] served any penological interest"); *Morello v. James*, 627 F. Supp. 1571, 1574 (W.D.N.Y. 1986), *rev'd on other grounds by* 810 F.2d 344 (2d Cir. 1987), (finding that "the mere possession of ['property that relates to religious observance, such as a Bible or a crucifix'] is constitutionally protected" and "its intentional destruction or deprivation by State officials (if unaccompanied by a compelling justification) is itself a violation of a substantive constitutional right").

The foregoing case law constitutes sufficient foreshadowing of the particular right at issue in this case. While it may become clear later in these proceedings that defendants acted in furtherance of a legitimate penological interest, taking the facts alleged in the second amended complaint as true, I find that plaintiff's right to wear a crucifix, where there is no legitimate penological interest precluding such conduct, was a clearly established right at the time defendants Springer and Mallernee confiscated plaintiff's necklace.

The last consideration of a qualified immunity analysis asks whether, even assuming the defendants violated a plaintiff's clearly established constitutional rights, it was objectively reasonable for officers in the defendants' position to have believed that their conduct was lawful. *Higazy*, 505 F.3d at 169-70. In this instance, in light of the procedural posture of the case and my obligation to accept the facts alleged in the second amended complaint as true, I find that no officer in the positions of either defendant Springer or Mallernee would have believed that their confiscation of plaintiff's crucifix, without any penological justification, was lawful. In this respect, the court takes judicial notice of DOCCS Directive

4202,[9] which permits inmates to possess a "religious medallion," including a "Cross." DOCCS Directive, Religious Programs and Practices No. 4202, available at http://www.doccs.ny.gov/directives/4202.pdf (last visited Aug. 11, 2015). DOCCS Directive 4202 also states that, "[w]hen worn, a medallion shall be affixed to a metal chain[.]" *Id.* Plaintiff in this matter alleges that his crucifix was attached to a silver chain, in compliance with the relevant DOCCS rules and policies. Although not dispositive of whether an officer in the defendants' position would have reasonably believed his conduct was not adverse to any of plaintiff's constitutional rights, defendants Springer and Mallernee at least should have been aware that confiscating plaintiff's crucifix was contrary to DOCCS Directive 4202. Accordingly, I conclude that it was not objectively reasonable for defendants Springer and Mallernee to believe that confiscating plaintiff's crucifix without any justification was lawful. *See Russell v. Coughlin*, 910 F.2d 75, 79 (2d Cir. 1990) (finding that it was not reasonable for the defendants to believe that they were not violating the plaintiff's constitutionally protected liberty interest by releasing him from

---

[9] *See, e.g., Williams v. Fischer*, No. 11-CV-0379, 2015 WL 1137644, at *4 n.7 (N.D.N.Y. Mar. 11, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.) (taking judicial notice of DOCCS Directive 4202); *Phelan v. Zenzen*, No. 10-CV-06704, at *4 (W.D.N.Y. Nov. 6, 2012) (taking judicial notice of DOCCS Directive 4421).

administrative confinement three days later than New York State regulations mandated).

For all of the reasons discussed above, I recommend defendants' motions to dismiss be denied, without prejudice, to the extent they seek dismissal of plaintiff's second amended complaint on the basis of qualified immunity.[10]

---

[10] It is worth noting that, even assuming defendants seek dismissal of plaintiff's RLUIPA claim on the basis of qualified immunity, that legal theory is not available. Plaintiff seeks declaratory, injunctive, and monetary relief, against the defendants in their individual and official capacities. Dkt. No. 10 at 2, 8-9. Qualified immunity does not apply to lawsuits against individuals in their official capacities. *Mitchell v. Forsyth*, 472 U.S. 511, 556 n.10 (1985) (Brennan, J., concurring in part and dissenting in part) (citing *Brandon v. Holt*, 469 U.S. 464 (1985)). With respect to plaintiff's RLUIPA claim, there is no cognizable private right of action against state officers sued in their individual capacities, and the RLUIPA does not allow for the award of monetary damages against state officers sued in their official capacities. *Gonyea*, 731 F.3d at 144 (citing *Sossaman v. Tex.*, 131 S. Ct. 1651, 1656 (2011)); *accord, Holland*, 758 F.3d at 224 ("RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities."); *Williams v. Leonard*, No. 11-CV-1158, 2015 WL 3544879, at *1 (N.D.N.Y. June 4, 2015) (McAvoy, J.) ("[T]o the extent that Plaintiff seeks monetary damages against the Defendants in their individual or official capacities under the RLUIPA, such damages are not available."). Plaintiff's RLUIPA claim, therefore, is limited to injunctive and declaratory relief against the defendants in their official capacities. Accordingly, qualified immunity has no bearing on plaintiff's RLUIPA claim. *See, e.g., Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1065 (2d Cir. 1995) ("[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities, and it protects only against claims for damages, not against claims for equitable relief."); *accord, Ford v. Reynolds*, 316 F.3d 351, 356 (2d Cir. 2003).

## IV. SUMMARY AND RECOMMENDATION

Plaintiff has commenced this action alleging that the defendants' confiscation of his crucifix, which he wore around his neck in accordance with the relevant prison regulations, violated his rights under the First Amendment and RLUIPA. Because the allegations in the operative pleading, when liberally construed, plausibly suggest that defendants' conduct substantially burdened his ability to exercise his sincerely held religious beliefs, defendant Springer's motion to dismiss in this respect should be denied. In addition, because there are no allegations in plaintiff's second amended complaint that suggest defendants confiscated his crucifix in furtherance of a legitimate penological interest, I find that extending qualified immunity to defendants at this juncture is premature.

Accordingly, it is hereby respectfully

RECOMMENDED that defendant Mallernee's motion to dismiss (Dkt. No. 27) and defendant Springer's motion to dismiss (Dkt. No. 36) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     August 17, 2015
           Syracuse, New York


David E. Peebles
U.S. Magistrate Judge

2012 WL 3345317
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Abdul MALIK, a/k/a/ " Bryon E. Rogers," Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 11 Civ. 6062(PAC)(FM).    |    Aug. 15, 2012.

### REPORT AND RECOMMENDATION TO THE HONORABLE PAUL A. CROTTY

FRANK MAAS, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Abdul Malik ("Malik"), also known as Bryon E. Rogers, is currently detained at the Manhattan Detention Complex ("MDC"). He brings this action, pursuant to 42 U.S.C. § 1983 ("Section 1983"), seeking monetary and injunctive relief. In his complaint (ECF No. 2 ("Complaint" or "Compl.")), Malik alleges that he was forced to wear prison-issued sneakers that have caused him physical problems while in the custody of the New York City Department of Correction ("DOC"), and that he has suffered other mistreatment by correction officers. Malik has named as defendants the City of New York; the Superintendent of the MDC, Rose Agro ("Superintendent Agro"); and correction officers Aviles ("Officer Aviles") and A.D. Santiago ("Officer Santiago") (collectively, the "Defendants").[1] The Defendants have moved to dismiss Malik's Complaint pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the Defendants' motion be granted in part and denied in part.

## I. *Background*

### A. *Relevant Procedural History*
Malik's Complaint is dated August 17, and was received by the *Pro Se* Office of this Court on August 19, 2011. (Compl. at 1, 18).[2] By order dated October 13, 2011, Your Honor referred the case to me for general pretrial and dispositive motion purposes. (ECF No. 8). Thereafter, by order dated January 9, 2012, I directed the Defendants to file their motion to dismiss by February 3, 2012, and gave Malik twenty-eight

days to respond. (ECF No. 15). The order was mailed to Malik at the Willard Drug Treatment Campus ("Williard"), his last known address, but was returned to the Court with an indication that he had been released from that facility. (*See* ECF No. 21).

On February 2, 2012, the Defendants filed their motion to dismiss the Complaint. (ECF No. 17). Because it appeared that Malik had not received my January 9 order, I directed, on March 21, 2012, that Malik provide a response to the Defendants' motion by April 18, 2012. (ECF No. 21). The Court then received two letters from Malik dated March 16 (ECF No. 22 ("PL's 1st Opp'n")), and April 12, 2012 (ECF No. 24 ("PL's 2d Opp'n")). The latter submission included documents opposing the Defendants' motion that he previously sent to the Court, but which were labeled improperly and had been returned to him. (*Id.* at 11–33).

After I discovered that the version of the Complaint originally docketed by the Clerk of the Court did not contain every page of the Complaint, the Defendants were permitted to file any additional papers necessary to respond to the entire Complaint and to reply to Malik's opposition letters. (ECF Nos. 25, 26). Malik also was granted leave to file a supplemental response within ten days of his receipt of the Defendants' additional papers. (ECF No. 25).

On May 16, 2012, the Defendants served and filed a reply memorandum of law. (ECF No. 27). Malik, however, has not submitted any further papers.

### B. *Facts*
**\*2** Unless otherwise noted, the following facts, taken from the Complaint and Malik's letters opposing the motion, are presumed to be true.

Malik was arrested and taken to the MDC on May 28, 2011, on a larceny charge.[3] (*See* Compl. at 4). Once there, he was allowed to wear his "Starbury sneakers size (14) EEE" until June 7, 2011, when correction officers conducted an "institutional" strip search of Malik as well as a search of his cell. (*Id.*). During the search, Officer Aviles, who noticed that Malik was wearing a kufi cap, made disparaging comments such as "M[u]sl[i]ms gotta get naked too," "come on, let me see what you are working with," "shut the fuck up, no talking during the search," and "take that yamaka or koooofi-off bombmaker [.]" (*Id.* at 4–5). Officer Aviles stepped on, ripped up, and destroyed Malik's Quran and Bible, broke his radio

and commissary items, and refused his requests to speak to a captain. (*Id.* at 4–5; PL's 2d Opp'n at 13–14). Malik practices Islam and the Quran is sacred to his religion. (PL's 2d Opp'n at 14).

Officer Santiago later entered Malik's cell, told Officer Aviles to take Malik's belongings if he was a "problem," and threatened Malik by standing two inches from his face, saying "do something 'nigger' and we'll 'wash your black ass in here.' " (Compl. at 5). The officers then pushed Malik onto his bed and took his sneakers, even though Malik showed them a doctor's note that permitted him to wear the sneakers and told them that he needed to wear the sneakers because of his large, flat feet. (*Id.* at 5–6; PL's 2d Opp'n at 16, 21). Officer Santiago responded, "I don't care about your feet[;] if you got a problem, write a grievance. [Y]ou fuck with me, I fuck you up the ass with no grease[.]" (Compl. at 6). According to Malik, the officers' comments made him feel "dirty" and "violated," and he feared for his safety. (*Id.* at 4–5).

Malik was forced to wear "inadequate, cheaply made" prison-issued footwear that caused him numerous problems. (*Id.* at 6). Malik alleges that the DOC does not take into account "people in [his] situation," or handicapped prisoners, and arbitrarily chooses who is required to wear prison-issued footwear. (*Id.* at 7–8). Malik further alleges that the City of New York and Superintendent Agro "knew [the prison-issued shoes] were inadequate, cheaply made[ ] and manufactured[,] and that they caused numerous feet problems." (*Id.* at 6).

Although Malik evidently had been permitted to retain his sneakers during prior periods of detention, (*see id.* at 4), the DOC changed its policy effective January 7, 2011, several months before Malik's May 2011 arrest. (Pl.'s 2d Opp'n at 28). Under the revised policy, adolescent and "Special Category" inmates are not permitted to keep personal footwear. Instead, they are issued one pair of DOC footwear either at the time of admission or "during their processing into a Special Category later in their incarceration." (*Id.*). Adult inmates who are not in Special Categories are "permitted to keep one pair of personal footwear (sneakers or shoes; permissible type only)." [4] (*Id.*). Malik alleges that the Defendants "systematically created a 'health' and 'safety' haz[ ]ard by rushing to change the policy with 'no regard' for the 'health' and 'welfare' of the inmates, with total disregard for [their] 'saf[e]ty' and 'well being[.]' " (Compl. at 7). Malik also alleges that the Defendants are violating the DOC's own notice, posted throughout the MDC, which allows "inmates," other than adolescents and Special Category inmates, to retain

one pair of personal footwear. (PL's 2d Opp'n at 19–20, 28–30).

**\*3** Malik spoke with unnamed DOC captains about his footwear concerns, and was told to file a grievance. (Compl. at 8). Malik did file such a grievance at the MDC, but subsequently was moved at least three times in three weeks among facilities at Rikers Island because of his grievances. [5] (*Id.* at 9). Malik also filed a grievance at the GRVC. Because Malik was " 'bounced' around the system" before receiving a response to his MDC grievance, he did not file any appeals regarding his grievances, and claims that he could not exhaust his administrative remedies. (PL's 1st Opp'n at 1). Nevertheless, Malik wrote to Superintendent Agro and verbally complained to the medical staffs at three Rikers facilities, as well as a "gr[ie]vance lady" at the GRVC and a captain at the GMDC. (*Id.;* Pl.'s 2d Opp'n at 1, 4). Malik alleges that the DOC also attempted to keep him from following through on his grievances by (1) failing to have grievance forms available; (2) failing to pick up grievances from the GRVC dropbox; (3) failing to acknowledge his grievances at the MDC; and (4) having a Captain at the GMDC write down Malik's name and telephone numbers, saying that he would "address the issue." (PL's 1st Opp'n at 1).

As a result of wearing the prison-issued footwear, Malik "suffered numerous foot, back and neck problems" including acute callouses on both feet, and had difficulty walking and standing. (Compl. at 7–8). After Malik left DOC custody for Willard, a state facility, he had to spend time in a prison medical unit, where he was told that he had "water on [his] knees and art[h]ritis[.]" (*Id.* at 9).

Annexed to Malik's papers is a letter dated February 24, 2012, in which Dr. Pravin Ranjan, of New York City Correctional Health Services, states that Malik should be permitted to wear supportive footwear for medical reasons. (Pl.'s 1st Opp'n at 5). Malik alleges that he had a similar doctor's note when his sneakers first were confiscated. (Pl.'s 2d Opp'n at 21).

Malik also has produced two emails written by an attorney at the Legal Aid Society and sent to several members of the New York City Board of Correction ("BOC") in July 2010 and May 2011. (Pl.'s 2d Opp'n at 32–33). The emails were written on behalf of other Rikers inmates who allegedly also were not permitted to wear medically-necessary personal footwear. (*Id.*). In the July 2010 email, the Legal Aid attorney noted that, "[t]his reported seizure of medically necessary support shoes appears to be another clear violation of [BOC]

Minimum Health Care Standards which prohibit interference with medical care and treatment by correction officers and which we have implored DOC, [the Department of Health] and BOC to put a stop to for years since the initial requirement that all inmates wear DOC-issued footwear unless exempted for medical reasons ." (*Id.* at 33).

Malik seeks injunctive relief to revise the DOC's footwear policy and train its officers, and $1 million for "pain and suffering, mental anguish, 'mental trauma,' violation of [his] religious rights, violation of [his] civil rights, and damage of [his] personal items." (Compl. at 16).

## II. *Standard of Review*

**\*4** A complaint must be dismissed under Rule 12(b)(1) if a court lacks subject matter jurisdiction over the action. In deciding a Rule 12(b)(1) motion, a court is not limited to the face of the complaint and may consider evidence outside the pleadings to resolve disputed factual issues. *State Emp. Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 77 n. 4 (2d Cir.2007). A plaintiff has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists. *Phifer v. City of N.Y.,* 289 F.3d 49, 55 (2d Cir.2002) (citing *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)).

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must dismiss a complaint that fails to state a claim upon which relief can be granted. In deciding a motion under Rule 12(b) (6), a court must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164 (1993); *Allaire Corp. v. Okumus,* 433 F.3d 248, 249–50 (2d Cir.2006). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). While this does not require detailed factual allegations, it does require "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" or "naked assertion[s] devoid of further 'factual enhancement.' " *Id.* at 679. Determining whether the allegations of a complaint nudge a plaintiff's claims across the line from "conceivable to plausible" requires a court to "draw on its judicial experience and common sense." *Id.* at 680. Moreover, the Court is "not bound to accept as true" legal conclusions couched as factual allegations. *Twombly,* 550 U.S. at 555.

In deciding a Rule 12(b)(6) motion, "the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken." *Associated Fin. Corp. v. Kleckner,* No. 09 Civ. 3895(JGK), 2010 WL 3024746, at *1 (S.D.N.Y. Aug. 3, 2010) (citing *Chambers v. Time Warner, Inc.,* 292 F.3d 147, 153 (2d Cir.2002)). The Court may take judicial notice of indisputable facts that are "generally known within the trial court's territorial jurisdiction" or "can accurately and readily be determined from sources whose accuracy cannot reasonably be questioned." *See* Fed.R.Evid. 201(b). The Court also must read a *pro se* complaint "liberally" and interpret it "to raise the strongest arguments" that it may suggest. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (internal quotation omitted).

**\*5** On a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b) (6), the Court must first analyze whether it has subject matter jurisdiction under Rule 12(b)(1) before considering the merits of the action under Rule 12(b)(6). *Sokolowski v. Metro. Transp. Auth.,* No. 11 Civ. 2623(JGK), 2012 WL 1027738, at *1 (S.D.N.Y. Mar. 28, 2012) (citing *Rhulen Agency, Inc. v. Alabama Ins. Guar. Assn,* 896 F.2d 674, 678 (2d Cir.2000); *McKevitt v. Mueller,* 689 F.Supp.2d 661, 664 (S.D.N.Y.2010)).

## III. *Discussion*

The Defendants move to dismiss the Complaint on the grounds that Malik (a) failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"); (b) failed to allege a cognizable constitutional claim; (c) failed to allege sufficient personal involvement by Superintendent Agro; (d) failed to allege municipal liability; and (e) is not entitled to injunctive or compensatory relief. (ECF No. 18 (Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.")) at 1).

## A. *Factual Allegations in Opposition Papers*

At the outset, the Defendants argue that the Court should not consider any factual allegations raised for the first time in Malik's opposition papers. In general, a court will not consider factual allegations advanced for the first time while opposing a motion. *See Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998). The mandate to read a *pro se* plaintiff's papers liberally, however, makes it appropriate to

consider factual allegations in Malik's opposition papers, in addition to those in his Complaint, in resolving the motion to dismiss. *See Omoniyi v. Dep't of Homeland Sec.,* No. 10 Civ. 1344(DF), 2012 WL 892197, at *5 (S.D.N.Y. Mar. 13, 2012); *Richardson v. New York,* No. 10 Civ. 6137(SAS), 2012 WL 76910, at *1 n. 10 (S.D.N.Y. Jan. 9, 2012); *Crum v. Dodrill,* 562 F.Supp.2d 366, 373 n. 13 (N.D.N.Y.2008) (citing *Gadson v. Goord,* No. 96 Civ. 7544(SS), 1997 WL 714878, at *1 n. 2 (S.D.N.Y.Nov.17, 1997)); *Collins v. Goord,* 438 F.Supp.2d 399, 403 n. 1 (S.D.N.Y.2006)).

**B. *Subject Matter Jurisdiction***
In their papers, the Defendants do not expressly state the basis for their motion to dismiss for lack of subject matter jurisdiction. To the extent that they maintain that the Court lacks jurisdiction over this action because Malik failed to exhaust his administrative remedies, the Defendants' motion must be denied because the PLRA's exhaustion requirement is not jurisdictional. *See Woodford v. Ngo,* 548 U.S. 81, 101–02 (2006); *Richardson v. Goord,* 347 F.3d 431, 433–34 (2d Cir.2003) (*per curiam* ). Rule 12(b)(1) therefore is not the appropriate means to seek the dismissal of Malik's claims based on his alleged failure to exhaust his administrative remedies. *See Roland v. Smith,* No. 10 Civ. 9218(VM), 2012 WL 601071, at *2 (S.D.N.Y. Feb. 22, 2012) (citing *Varela v. Demmon,* 491 F.Supp.2d 442, 445–46 (S.D.N.Y.2007)).

**C. *Exhaustion of Administrative Remedies***
 **\*6** A Rule 12(b)(6) motion is the proper vehicle for dismissal of a complaint on PLRA exhaustion grounds if the plaintiff's failure to exhaust is apparent from the face of the complaint. *Jones v. Bock,* 549 U.S. 199, 215 (2007); *McCoy v. Goord,* 255 F.Supp.2d 233, 249 (S.D.N.Y.2003) (citing *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74–75 (2d Cir.1998)). In that connection, the PLRA provides that "no action shall be brought with respect to prison conditions under ... any ... Federal law, by a prisoner confined in any jail, prison, or any other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has clarified that this "means using all steps that the agency holds out, and doing so *properly,* " which requires "compliance with [the] agency's deadlines and other critical procedural rules." *Woodford,* 548 U.S. at 81 (internal quotation marks omitted); *see Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir.2009). "The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA,

that define the boundaries of proper exhaustion." *Jones,* 549 U.S. at 218; *see Espinal v. Goord,* 558 F.3d 119, 124 (2d Cir.2009). "Failure to exhaust is an affirmative defense, and it is [the D]efendants' burden to establish non-exhaustion." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (collecting cases).

A person detained or incarcerated at a DOC facility must exhaust all of the steps of the DOC Inmate Grievance Resolution Program ("IGRP"). [6] This requires that the individual (1) file a grievance with the Inmate Grievance Review Committee ("IGRC"); (2) request a formal hearing before the IGRC if the grievance has not been resolved informally or the prisoner has not received a response within five days; (3) appeal any adverse decision by the IGRC to the commanding officer or his designee; (4) appeal any adverse decision by the commanding officer to the DOC Central Office Review Committee ("CORC"); and (5) appeal any adverse decision by CORC to the BOC. *See Martin,* 2012 WL 1392648, at *5; IGRP Directive ¶ IV(B). Each appellate step of the process sets forth a time limit for a decision, after which the grievant may appeal to the next level if his appeal remains undecided. IGRP Directive ¶ IV(C)(6).

Malik alleges that he filed grievances at the MDC and GRVC, but concedes that he did not appeal any further through the administrative process. (*See* Compl. at 19). Although he also wrote to Superintendent Agro and made informal complaints to medical staff, these efforts did not constitute compliance with the DOC's written grievance procedures and, therefore, do not satisfy the requirement that he exhaust his grievance properly. *See Macias v. Zenk,* 495 F.3d 37, 43–44 (2d Cir.2007).

 **\*7** Malik nevertheless seeks to be excused from the exhaustion requirement because the DOC allegedly never responded to his grievances and prevented him from following up on, or filing, additional grievances. A prisoner's failure to exhaust administrative remedies before filing a complaint in federal court may be excused if (1) administrative remedies were in fact unavailable; (2) the defendants forfeited the affirmative defense of non-exhaustion by failing to preserve or raise it, or their actions estop them from doing so; or (3) special circumstances justify the failure to properly exhaust. *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). [7] "[T]he same facts sometimes fit into more than one of these categories." *Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

Malik may not be excused from the exhaustion requirement based solely on the DOC's failure to respond to his grievances. Under the IGRP, if a prisoner has not received a response to a grievance within five days, the prisoner is required to sign another grievance form requesting a hearing, after which the IGRC must hear the complaint and render a decision within three days of the request for a hearing. *See* IGRP Directive ¶ IV(B)(1)(d)(I). Malik correctly observes in his opposition that courts in other circuits have held that administrative remedies are unavailable when prison officials fail to respond to a prisoner's grievance within the timeframe established by a prison's grievance procedures. (Pl.'s 1st Opp'n at 1–2); *see Marcello v. Dep't of Corr.,* No. 07 Civ. 9665(NRB), 2008 WL 2951917, at \*3 (S.D.N.Y. July 30, 2008) (citing *Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir.2002); *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir.2002); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir.1998)). Unlike the prison grievance procedures addressed in those cases, however, the IGRP places the burden on the prisoner to request a formal hearing when there is no timely response to a grievance. Therefore, under the IGRP, a prisoner who does not receive a response from a grievance within five days but fails to request a hearing is not excused from the requirement of exhaustion, unless prison officials prevented him from requesting the hearing or taking further steps in the IGRP process. *See Rivera,* 2012 WL 383941, at \*5; *Mamon v. N.Y.C. Dep't of Corr.,* No. 10 Civ. 8055(NRB), 2012 WL 260287, at \*4 (S.D.N.Y. Jan. 27, 2012); *Marcello,* 2008 WL 2951917, at \*3–4. In the absence of any allegation that Malik was misinformed about the applicable procedures or not provided information about them, Malik's apparent ignorance of the IGRP procedures applicable after the initial filing of a grievance does not excuse his failure to follow each step. *See Bryant v. Williams,* No. 08 Civ. 778S, 2009 WL 1706592, at \*8 (W.D.N.Y. June 17, 2009).

Malik's assertion that he was prevented from pursuing his grievances because he was transferred to other DOC facilities is similarly insufficient to excuse his failure to exhaust. A prisoner is not excused from the exhaustion requirement if he files a grievance while in DOC custody and has the opportunity to exhaust his administrative remedies before being released or transferred to another agency's custody. *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003); *see also Flowers v. City of N.Y. (DOCS),* 668 F.Supp.2d 574, 578 (S.D.N.Y.2009) (prisoner's failure to exhaust argument based on his transfer from City to State custody rejected because he failed to explain why he could not exhaust his remedies during the three months before his transfer); *Hill v. U.S.*

*Attorney's Office, E.D.N.Y.,* No. 08 Civ. 1045(JS)(AKT), 2009 WL 2524914, at \*5 (E.D.N.Y. Aug. 14, 2009) (prisoner who had ten days to file a grievance before transfer to another prison had sufficient time to exhaust administrative remedies). Here, Malik alleges that he was transferred to at least three different facilities on Rikers Island between June 7 and 24, 2011, and never received a response while being "bounced" around the system. Malik fails to allege, however, that these transfers prevented him from filing the form necessary to seek a hearing or further appealing his grievance during the seventeen days he remained in DOC custody. The transfers therefore are an insufficient basis to excuse Malik's failure to exhaust his administrative remedies.

**\*8** Malik further complains that grievance forms were not available and were not picked up at the GRVC. In *Ziemba v. Wezner,* 366 F.3d 161, 162–64 (2d Cir.2004), the Second Circuit held that administrative remedies may be unavailable, and defendants may be estopped from raising non-exhaustion as a defense, when, among other things, a prison fails to provide forms or process grievances. *See also Brown v. Fischer,* No. 09 Civ. 371(TJM)(DRH), 2010 WL 5797359, at \*3 (N.D.N.Y. Dec. 8, 2010), *adopted by* 2011 WL 552039 (N.D.N.Y. Feb. 9, 2011) (failure to exhaust potentially excusable where prison officials did not provide grievance form to prisoner for "multiple weeks"); *Bailey v. Fortier,* No. 09 Civ. 742(GLS)(DEP), 2010 WL 4005258, at \*6–7 (N.D.N.Y. Aug. 30, 2010), *adopted by* 2011 WL 3999629 (noting that "however skeptical the court may be," allegation that prison officials did not provide necessary grievance forms to prisoner precluded dismissal of complaint on exhaustion grounds); *Sandlin,* 575 F.Supp.2d at 488 (failure to exhaust excused because prison officials failed to provide grievance deposit boxes, forms and writing materials, and failed to accept or forward appeals); *Taylor v. Zerillo,* No. 08 Civ. 1494(JG), 2008 WL 4862690, at \*2 (E.D.N.Y. Nov. 10, 2008) (exhaustion issue should be decided at summary judgment stage when prisoner alleges that he was not told about grievance procedures, was not given any grievance forms, and was transferred from prison to prison to hinder the filing of a grievance); *Collins,* 438 F.Supp.2d at 414–15 (summary judgment on exhaustion grounds denied because prisoner contended that he could not obtain grievance forms and that prison officials failed to deliver his appeal). At this preliminary stage, Malik has sufficiently alleged that he was prevented from exhausting his administrative remedies because grievance forms were neither available nor processed. *See Ziemba,* 366 F.3d at 164 (if a court must look beyond the pleadings, "the district court

must allow factual development and address the estoppel claim at the summary judgment stage"). Accordingly, the Defendants' motion to dismiss Malik's claims for failure to exhaust his administrative remedies should be denied.

**D. *Inadequate Footwear***

"To state a claim under [Section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 47 (1988). Malik's pleadings may be liberally construed as raising deliberate indifference and due process claims relating to his footwear.

**1. *Deliberate Indifference***

As noted previously, (n.3 *supra* ), it is unclear whether Malik's confinement in 2011 was as a sentenced prisoner or as a pretrial detainee. Although claims of deliberate indifference brought by a pretrial detainee arise under the Fourteenth Amendment, while those of a convicted prisoner arise under the Eighth Amendment, both types of claims are subject to the same standard. *See Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) ("[c]laims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment").

**\*9** To establish a deliberate indifference claim arising out of prison conditions, an inmate must prove that (a) objectively, the condition was a "sufficiently serious" violation of the inmate's constitutional rights; and (b) subjectively, the defendant had a state of mind of "deliberate indifference" to inmate health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Liberally construed, the Complaint can be read to state a claim of deliberate indifference to Malik's medical condition by reason of his being forced to wear "inadequate, cheaply made" footwear. (*See* Compl. at 6).

Turning first to the objective prong of the deliberate indifference test, "[t]here is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2001). A sufficiently serious medical condition includes not only conditions that cause death, degeneration and extreme pain, but also conditions that cause or perpetuate chronic pain. *Id.* at 163. Among the factors to be considered in determining whether a medical condition is sufficiently

serious are whether the injury is one that a reasonable doctor or patient would find important and worthy of comment or treatment; significant effects on an individual's daily activities; and the existence of chronic or substantial pain. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). "[I]nmost cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith v. Carpenter,* 316 F.3d 178, 187 (2d Cir.2003).

At this preliminary stage, Malik has adequately alleged that he had a sufficiently serious medical condition. Malik contends, in that regard, that he had a doctor's note that allowed him to keep his sneakers, which suggests that he, in fact, had foot problems, and that prison-issued shoes were inadequate for his needs. Malik further alleges that after wearing the prison-issued shoes, he suffered foot, back, and neck problems, had difficulty walking and standing, spent extended time in a medical unit at Willard, and was told by medical staff that he had water on the knees and arthritis.

It is, of course, implausible that Malik would have developed arthritis and knee problems as the result of wearing prison-issued shoes for only a matter of weeks. Nevertheless, based upon the doctor's note that Malik alleges he had when his sneakers were taken away and the Willard medical staff's diagnosis of arthritis, it is plausible that Malik had a prior medical condition that was exacerbated by the conduct of Officers Aviles and Santiago. The medical problems described by Malik, as well as his constant complaints about the shoes to prison officials, suggest that he may have suffered chronic pain while wearing the prison-issued shoes.

**\*10** Moreover, the existence of the doctor's note and his subsequent medical diagnoses suggest that being deprived of his sneakers may have caused a sufficiently serious injury to meet the objective prong of his claim. *See id.* at 188 n. 14 ("the 'seriousness' determination [in Eighth Amendment denial of medical care cases] will often be ill-suited for resolution at the pleading stage and will have to await summary judgment proceedings, at which point a fully developed medical record will inform the court as to the nature of the inmate's condition") (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1372 n. 7 (7th Cir.1997)); *see also Paul v. Bailey,* No. 09 Civ. 5784(JSR)(JCF), 2010 WL 3292673, at \*5 (S.D.N.Y. July 21, 2010) (prisoner who described continual pain from prison-issues shoes, filed six grievances about the shoes in three months, reported for daily treatment of his wounds,

routinely bled on his sheets, and had doctors who concurred that he should be given medically-required shoes satisfied the objective prong).

Malik also sufficiently has alleged that Officers Aviles and Santiago acted with deliberate indifference, which is "something more than mere negligence, ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer, 511 U.S. at 834–35; see Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (likening deliberate indifference to "the equivalent of criminal recklessness") (internal quotation marks omitted). This threshold is met when defendants are "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and they, in fact, draw that inference. *Farmer,* 511 U.S. at 837.

Malik alleges that, during the institutional search, he showed the officers a doctor's note giving him permission to wear his sneakers rather than the prison-issued shoes, and that he further told the officers that he had large, flat feet with no arch. (*See* Compl. at 5–6; PL's 2d Opp'n at 16, 21). Malik's allegations that the officers were aware of a doctor's order that he should not wear the prison-issued footwear, but ignored the order, are sufficient to allege deliberate indifference. *See Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005) ("a deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians"); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) ("Prison officials are more than merely negligent if they deliberately defy the express instructions of a prisoner's doctors.").

Malik therefore has sufficiently alleged that the officers were deliberately indifferent to his serious medical needs, in violation of his constitutional rights.

## 2. *Due Process*

Malik further alleges that prison officials violated a right to wear his personal sneakers that had been granted to him by a prison notice posted throughout the MDC. This claim, liberally construed, constitutes a procedural due process claim. The notice in question states that adolescent and "Special Category" inmates will not be permitted to keep their personal footwear as of January 7, 2011, but that adult inmates not in Special Categories shall be permitted to keep one pair of "permissible" personal footwear. (PL's 2d Opp'n at 28). Malik presumably contends that he is not in a Special Category.

**\*11** "In a [Section] 1983 suit brought to enforce procedural due process rights, a court must determine [a] whether a property interest is implicated, and, if it is, [b] what process is due before the plaintiff may be deprived of that interest." *Nnebe v. Daus,* 644 F.3d 147, 158 (2d Cir.2011) (citation omitted). "[W]hen the deprivation is pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation hearing." *Rivera–Powell v. N.Y.C. Bd. of Elections,* 470 F.3d 458, 465 (2d Cir.2006) (citing *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.,* 101 F.3d 877, 880 (2d Cir.1996); *Parratt v. Taylor,* 451 U.S. 527, 541 (1981)).

Here, because the sneakers were taken during an institutional search, it is unclear whether an established state procedure is implicated. In any event, even if Malik had sufficiently alleged that his sneakers were taken away as part of an established state procedure, he has failed to show that he was entitled to pre-deprivation due process. "Due process requirements do not apply when the property interest involved is 'de minimis.' " *See Goss v. Lopez,* 419 U.S. 565, 576 (1975). In an unpublished decision, the Second Circuit has held that while a state statute granted a psychiatric patient civilly committed in a state-run psychiatric facility a property interest in having sneakers with laces while he was confined in the facility, his property interest was *de minimis* and the Due Process Clause was not implicated, because he "was deprived only of his *possessory* interest in his sneakers with laces, and he was provided state-issued sneakers with velcro straps as a substitute." *Zigmund v. Solnit,* 199 F.3d 1325, 1999 WL 758825, at *2 (2d Cir. Sept. 22, 1999) (emphasis in original). Similarly, Malik alleges that he was deprived of his possessory interest in his sneakers but concedes that he was given a voucher and provided with prison-issued shoes as a substitute. To the extent he seeks to vindicate rights related to the deprivation of his *property* as in *Zigmund,* his property interest in his sneakers was *de minimis.* His deprivation of property claim under Section 1983 consequently must be dismissed because, as set forth below, he had adequate post-deprivation state remedies.

## E. *Deprivation of Property*

Malik alleges that Officer Aviles intentionally damaged his religious books, radio, and commissary items. The intentional destruction of property not considered contraband obviously is not part of the established procedure for an institutional search. Nevertheless, such an intentional act by a state employee does not violate due process if a meaningful post-deprivation remedy is available under state law. *See Hudson*

*v. Palmer,* 468 U.S. 517, 533 (1986). New York provides such an adequate post-deprivation remedy in the form of state law causes of action for negligence, replevin, and conversion. *Dove v. City of N.Y.,* No. 99 Civ. 3020(DC), 2000 WL 342682, at *3 (S.D.N.Y. Mar. 30, 2000); *Cook v. City of N.Y.,* 607 F.Supp. 702, 704 (S.D.N.Y.1985); *Cantave v. N.Y.C. Police Officers,* No. 09 Civ. 2226(CBA)(LB), 2011 WL 1239895, at *7 (E.D.N.Y. Mar. 28, 2011). Accordingly, Malik's Section 1983 claim relating to the destruction of his property must be dismissed. [8]

## F. *Religious Claims*

**\*12** Malik's Complaint may also be read to allege that the actions of Officers Aviles and Santiago violated his right to the free exercise of religion under the First Amendment, and thus may also state a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). To succeed on a claim under the Free Exercise Clause, "the prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006). The Defendants then bear the "relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct[.]" *Id.* at 275. Under the RLUIPA, "a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates ... unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." *Id.* at 273–74 (citing 42 U.S.C. § 2000cc–1(a)).

Malik's allegations that he practices Islam and that Officers Aviles and Santiago ripped up and destroyed his sacred Quran states a legally sufficient claim under both the Free Exercise Clause and the RLUIPA. *See Hudson,* 468 U.S. at 547 n. 13 (Stevens J., concurring in part and dissenting in part) ("A prisoner's possession of ... personal property relating to religious observance, such as a Bible or a crucifix, is surely protected by the Free Exercise Clause of the First Amendment."); *Vega v. Lantz,* No. 04 Civ. 1215(DFM), 2006 WL 2788374, at *3, *13 (D.Conn. Sept. 26, 2006) (denying judgment on the pleadings with respect to claim that defendants mishandled prisoner's Quran during inspections by tossing it on the cell floor and touching it with their bare hands); *Shaw v. Norman,* No. 6:07 Civ. 443, 2009 WL 1780123, at *3–4 (E.D. Tex. June 22, 2009) (confiscation of Quran, which was "clearly central to the practice of the Plaintiff's religion," gave rise to a RLUIPA violation), *appeal dismissed,* 389 Fed. App'x 408, 409 (5th Cir.2010). Insofar as

the Defendants seek to dismiss Malik's religious claims, their motion therefore should be denied.

## G. *Verbal Abuse*

Verbal abuse, threats, and intimidation standing alone, without injury or damage, do not amount to a constitutional deprivation. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (name-calling without "any appreciable injury" is not a constitutional violation); *Jean–Laurent v. Wilkerson,* 438 F.Supp.2d 318, 325 (S.D.N.Y.2006) ("verbal intimidation does not rise to the level of a constitutional violation"); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("verbal harassment or profanity alone, 'unaccompanied by any injury no matter how inappropriate, unprofessional or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983"). To the extent Malik seeks any relief based on his allegations of verbal harassment, threats, and unprofessional conduct by Officers Aviles and Santiago, his claims consequently must be dismissed.

## H. *Strip Search*

**\*13** "The Fourth Amendment prohibits only unreasonable searches." *Bell v. Wolfish,* 441 U.S. 520, 558 (1979). In determining the reasonableness of a search, courts must "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559. Prison officials "must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington,* 132 S.Ct. 1510, 1517 (2012). The Supreme Court recently has held that prison officials may conduct a strip search of any prisoner, including detainees suspected of committing minor offenses, "unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." *Id.* at 1518 (quoting *Block v. Rutherford,* 468, U.S. 576, 584–85 (1984)). Nevertheless, the "[i]ntentional harassment of even the most hardened criminals cannot be tolerated by a civilized society[.]" *Hudson,* 468 U.S. at 528.

Malik has failed to allege sufficiently that the strip search was unreasonable. Although he complains about the manner in which the strip search was conducted based on the comments made by the officers, he does not allege any physical or sexual abuse. Moreover, Malik concedes that the strip search was part of an "institutional" search. Such "[r]outine random strip

searches of inmates, including body cavity inspections, do not violate the Fourth Amendment." *Castro–Sanchez v. N.Y. State Dep't of Corr. Servs.,* No. 10 Civ. 8314(DLC), 2011 WL 6057837, at *8 (S.D.N.Y. Dec. 6, 2011) (citing *N.G. v. Connecticut,* 382 F.3d 225, 232 (2d Cir.2004)); *see Covino v. Patrissi,* 967 F.2d 73, 77–80 (2d Cir.1992). His strip-search claim therefore must be dismissed. Additionally, to the extent that Malik's Complaint can be construed as alleging claims against the officers for illegally entering his cell, his claim must be dismissed because a prisoner does not have a reasonable expectation of privacy in his prison cell. *See Hudson,* 468 U.S. at 525–26.

## I. *Retaliation*

Malik further alleges that he was transferred to various Rikers Island facilities in retaliation for his grievances. To state a First Amendment claim for retaliation, a prisoner must demonstrate that: (a) he was engaged in constitutionally-protected activity, (b) the defendant took adverse action against the prisoner, and (c) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004). "[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, [courts] are careful to require non-conclusory allegations." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (internal quotations omitted).

 **\*14** Malik has sufficiently alleged that he was engaged in a constitutionally-protected activity by filing grievances. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983"); *see also Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001) (appeal of disciplinary order was protected by the First Amendment). Malik also has sufficiently alleged an adverse action based on his transfer to other prisons. *See Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) ("prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights").

At this stage, Malik further has alleged adequately that there was a causal connection between his grievances and the transfers. Malik alleges that he was transferred to various facilities on Rikers Island because of his grievances. To

sufficiently allege a causal connection, Malik's allegations must support an inference that the protected conduct was "a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett,* 343 F.3d at 137. A causal connection may be established by showing that the protected activity was closely followed in time by the adverse action. *See Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009). In *Espinal,* the passage of six months between the protected activity and the alleged retaliatory action was sufficient to support an inference of causal connection. *Id.* Here, Malik does not specify when he filed his first grievance, but states that he filed it at the MDC. If so, he must have filed the grievance within one week of the search on June 7, because he was transferred to the GRVC on June 14 and thereafter was transferred twice more before June 24. Given these numerous transfers within weeks after the filing of Malik's grievance, he has sufficiently alleged a causal connection based on the temporal proximity.

Where Malik's claim falters, however, is the lack of any allegations regarding the personal involvement of any named defendants in the decision to move Malik rapidly from one facility to another, allegedly in retaliation for the filing of his grievances. It is settled law that a defendant's personal involvement in an unlawful action is a prerequisite to an award of compensatory damages under Section 1983. *Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001). A plaintiff may establish the personal involvement of a supervisory defendant by showing that

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

 **\*15** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Here, Malik has failed to show any personal involvement on the part of the Defendants in connection with his retaliation claim. That claim therefore must be dismissed.


**J.** *Municipal Liability*

A complaint brought under Section 1983 alleging violations of a plaintiff's federally protected rights by a municipality, such as the City of New York, must include factual allegations suggesting the existence of an officially-adopted policy or custom of the municipality that caused plaintiff's injury. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown,* 520 U.S. 397, 403–04 (1997); *Monell v. Dep't of Soc. Servs. of City of N.Y.,* 436 U.S. 658, 694 (1978). A plaintiff need not identify an express rule or regulation; it is sufficient to show, for example, that a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law. *Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir.2004).


Malik further alleges that the City of New York has a policy or custom of providing inadequate footwear for prisoners. In support of this contention, Malik has provided emails from a Legal Aid attorney written on behalf of other Rikers inmates indicating that the DOC has not provided medical exemptions to its footwear policy "for years." (*See* PL's 2d Opp'n at 32–33). At this preliminary stage, the Legal Aid emails are sufficient to state a *Monell* claim against the City of New York based on a "pattern of similar constitutional violations." *See Connick v. Thompson,* 131 S.Ct. 1350, 1360 (2011); *see also Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir.2007) ("*Monell* 's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing."). The Defendants' motion to dismiss Malik's claims against the City of New York therefore should be denied.


**K.** *Superintendent Agro's Personal Involvement*

Malik's Complaint fails to allege sufficiently that Superintendent Agro was personally involved in any alleged constitutional violations. As Magistrate Judge Peck recently noted in a Report and Recommendation to Your Honor, it is unclear whether, and to what extent, the five *Colon* categories cited by the Second Circuit as bases for supervisory liability have survived the Supreme Court's decision in *Iqbal. See Inesti v. Hicks,* No. 11 Civ. 2596(PAC)(AJP), 2012 WL 2362626, at \*11 (S.D.N.Y. June 22, 2012). It nevertheless unquestionably remains the law that liability for damages in a Section 1983 action may not be based on the doctrines of

*respondeat superior* or vicarious liability. *Monell,* 436 U.S. at 691.

Malik alleges in conclusory terms that Superintendent Agro knew that he was provided with insufficient footwear. (Compl. at 6). The only factual basis for this allegation, however, is that Malik wrote Superintendent Agro a letter regarding his grievances. (PL's 2d Opp'n at 1, 4). This allegation is insufficient to make out a *prima facie* claim of personal involvement against supervisors. *See Shomo v. City of N.Y.,* 579 F.3d 176, 184 (2d Cir.2009) (dismissing Section 1983 supervisory liability claim for lack of personal involvement when "[t]he only allegation pertaining to these defendants [wa]s that [the plaintiff] filed complaints with [their offices]"); *but see Wright,* 21 F.3d at 502 (finding no personal involvement for supervisor who received letter from prisoner about general conditions of confinement without claims of specific unconstitutional procedures, but personal involvement for supervisor who had notice of unconstitutional procedures through service of court papers). Malik also has failed to allege that Superintendent Agro created or allowed the continuance of an unconstitutional policy or custom, or that she was grossly negligent in supervising subordinates who committed the allegedly wrongful acts. *See Alston v. Bendheim,* 672 F.Supp.2d 378, 389–90 (S.D.N.Y.2009) ("To maintain such a claim, ... an inmate must adequately 'allege that the official had actual or constructive notice of the unconstitutional practices and demonstrated gross negligence or deliberate indifference by failing to act.' "). For these reasons, Malik's claims against Superintendent Agro must be dismissed.


**L.** *Limitations on Relief*

**\*16** Citing the PLRA, 42 U.S.C. § 1997e(e), the Defendants seek an order dismissing Malik's claims to the extent that they do not allege a physical injury. The Defendants further seek the dismissal of Malik's claims for equitable relief.

Section 1997e(e) states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." Thus, under the statute, a "plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury." *Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002). Section 1997e(e), however, does not contain any limitations on injunctive or declaratory relief, nominal and punitive damages, or damages for a physical injury or mental or

emotional injury suffered in addition to the physical injury. *See id.* at 418–19. The statute also does not bar compensatory damages for the loss of property. *Id.* at 418.

Furthermore, a plaintiff need not plead physical injury in a complaint covered by the PLRA. *See Frieson v. City of N.Y.,* No. 11 Civ. 4611(JGK), 2012 WL 1948782, at *2 (S.D.N.Y. May 30, 2012) (denying motion to limit damages pursuant to § 1997e(e) because, "at the motion to dismiss stage, the Court cannot, and need not, conclusively resolve the factual question of whether or not the plaintiff suffered physical injury in addition to his claimed mental and emotional injury"); *In re Nassau Cnty. Strip Search Cases,* No. 99 Civ. 2844(DRH), 2010 WL 3781563, at *2 (E.D.N.Y. Sept. 22, 2010) ("As § 1997e(e) is a limitation on recovery and not an affirmative defense to liability, it need not be pled.").

The Defendants' motion mistakenly assumes that the only injury that a plaintiff may suffer without a physical injury is mental or emotional harm. The Second Circuit has held, however, that intangible deprivations of liberty and personal rights are distinct from claims for pain and suffering, mental anguish, and mental trauma. *See Kerman v. City of N.Y.,* 374 F.3d 93, 125 (2d Cir.2004) ("The damages recoverable for [a plaintiff's Fourth Amendment claims] are separable from damages recoverable for such injuries as physical harm, embarrassment, or emotional suffering."). Accordingly, the PLRA's physical injury requirement does not bar an award of compensatory damages for First Amendment violations. *See Rowe v. Shake,* 196 F.3d 778, 781 (7th Cir.1999) ( "A prisoner is entitled to judicial relief for a violation of his First Amendment rights aside from any physical, mental or emotional injury he may have sustained"); *Canell v. Lightner,* 143 F.3d 1210, 1213 (9th Cir.1998) ( Section 1997e(e) "does not apply to First Amendment claims regardless of the form of relief sought"); *Pacheco v. Drown,* No. 06 Civ. 0020(GTS) (GHL), 2008 WL 144400, at *13 (N.D.N.Y. Jan. 11, 2010) (Section 1997e(e)'s physical injury requirement does not apply to First Amendment violations) (citing *Auleta v. LaFrance,* 233 F.Supp.2d 396, 403 (N.D.N.Y.2002); *Cancel v. Mazzuca,* 205 F.Supp.2d 128, 138 (S.D.N.Y.2002)); *Lipton v. Cnty. of Orange, N.Y.,* 315 F.Supp.2d 434, 457 (S.D.N .Y.2004) (an exception to the PLRA's physical injury requirement for compensatory damages exists where a prisoner's claims arise under the First Amendment).

**\*17** The claims that survive the Defendants' motion are not subject to the PLRA's limitations on compensatory damages without a physical injury for several reasons. First, Malik's

religion and retaliation claims allege deprivations of personal rights under the First Amendment which do not fall under the PLRA's physical injury requirement for compensatory damages. Second, there is no limitation on the damages arising out of Malik's allegedly inadequate medical care claim because he *has* alleged a physical injury. Finally, to the extent the Court exercises supplemental jurisdiction, Malik's claims for loss of property are not barred by the PLRA. *See Thompson,* 284 F.3d at 418. The defendants motion to limit Malik's damages award at this early stage therefore must be denied.

The Defendants also contend that Malik is not entitled to injunctive relief because he was released from DOC custody after his grievance was filed. While Malik was not in DOC custody at the time that he filed his Complaint, he has since returned to DOC custody. It follows that the Court cannot conclude that the privations that Malik allegedly suffered in the past will not recur. In particular, to the extent that Malik is still being forced to wear prison-issued shoes, his request for injunctive relief should be permitted to survive the Defendants' motion to dismiss.

## IV. *Conclusion*

For the foregoing reasons, the Defendants' motion to dismiss should be granted in part and denied in part.

## V. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed.R.Civ.P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty and to my chambers at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U . S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Crotty. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3345317

Footnotes

1    On October 13, 2011, the Court issued a *sua sponte* order dismissing Malik's claims against the DOC and the Office of Corporation Counsel on immunity grounds. (ECF No. 9).

2    The Complaint has two attachments. For ease of reference, page numbers refer to the ECF pagination.

3    Malik's current confinement at the MDC appears unrelated to the facts of this case since the DOC inmate locator indicates that he was arrested on a misdemeanor drug charge. The DOC website also indicates that three state parole violation warrants have been lodged with the DOC. It is therefore unclear whether his time in custody in 2011 was the result of a parole violation, the larceny charge, or both.

4    The DOC notice of this policy change does not explain the term "Special Category inmates," nor does it explain what types of sneakers are "permissible." As noted above, it also is unclear from the record whether Malik was an inmate or a pretrial detainee on June 7, when his sneakers were taken.

5    When Malik filed his Complaint, he was imprisoned at Willard. (Compl. at 1). Attached to Malik's Complaint are commissary purchase and property receipts indicating that Malik was at the MDC on June 8, 2011; the George R. Vierno Center ("GRVC") on June 14, 2011; and the Eric M. Taylor Center ("EMTC") on either June 14 or 19, 2011 (the handwriting is unclear). (*Id.* at 11–13). Malik also states that his "next and last stop" was at the George Motchan Detention Center ("GMDC"). (PL's 2d Opp'n at 4). Malik states that he was in DOC custody until approximately June 24, 2011. (PL's 1st Opp'n at 2). In a letter dated February 8, 2012, Malik stated that he was back at the MDC after violating parole, and had been in hospitals, drug rehabilitation centers, and county jail before then. (ECF No. 20). Malik's latest letter to the Court indicated that he was again imprisoned at the GRVC. (PL's 2d Opp'n at 9). It is unclear whether Malik is currently being required to wear the prison-issued shoes.

6    The Court may take judicial notice of the IGRP, which is detailed in DOC Directive Number 3375R–A ("IGRP Directive") (available online at http:// www.nyc.gov/html/doc/downloads/pdf/3375R-A.pdf). *See, e.g., Martin v. City of N.Y.,* No. 11 Civ. 600(PKC)(RLE), 2012 WL 1392648, at *5 n. 2 (S.D.N.Y. Apr. 20, 2012) (citing cases taking judicial notice of the IGRP).

7    The Second Circuit has yet to rule on whether *Hemphill* remains good law following the Supreme Court's decision in *Woodford* that a prisoner must comply with all of a prison's grievance procedures before seeking relief in federal court. 548 U.S. at 81; *see Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (declining to reach the issue because appellant failed to establish that the defendants were estopped from raising exhaustion as a defense or that "special circumstances" existed); *see also Macias,* 495 F.3d at 43 n. 1 (declining to reach issue). As Judge Holwell has noted, courts in this Circuit have acknowledged the tension between the two cases, but have continued to apply *Hemphill. See, e.g., Rivera v. Anna M. Kross Ctr.,* No. 10 Civ. 8696(RJH), 2012 WL 383941, at *3 n. 1 (S.D.N.Y. Feb. 7, 2012) (citing *Harrison v. Goord,* No. 07 Civ. 1806(HB), 2009 WL 1605770, at *6 n. 6 (S.D.N.Y. June 9, 2009); *Winston v. Woodward,* No. 05 Civ. 3385(RJS), 2008 WL 2263191, at *6 (S.D.N.Y. May 30, 2008)).

8    Although Malik has not asserted a viable federal due process claim, his Complaint, liberally construed, could be read to assert the potentially-applicable state law causes of action. If this case ultimately reaches the trial stage, the Court may wish to have these state law causes of action considered by the trier of fact. Alternatively, if summary judgment eventually is granted with respect to Malik's federal claims, the Court may wish to dismiss Malik's state law claims rather than exercise supplemental jurisdiction. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988); *see also* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction ... if ... the district court has dismissed all claims over which it has original jurisdiction."). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ.,* 484 U.S. at 350 n. 7; *see also Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y.,* 464 F.3d 255, 262 (2d Cir.2006) ("It is well settled that where ... the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

WestlawNext® © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3925267
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Leon Eugene MORRIS, Plaintiff,

v.

J. WOODFORD, Former
Director; et al., Defendants.

No. C 08–3435 SI (pr).  |  Nov. 18, 2009.

West KeySummary

**1**  **Constitutional Law**

　🗝 Prisons and Pretrial Detention

**Prisons**

　🗝 Services, Ceremonies, Texts, Study, and
Prayer

Prisoner stated a cognizable claim under the free
exercise clause of the First Amendment's right to
freedom of religion and under the Religious Land
Use and Institutionalized Persons Act against
prison employees based on the alleged denial and
confiscation of his Quran and other Islamic study
and prayer materials. A prison sergeant allegedly
denied the prisoner his Quran. On another date,
a correctional officer allegedly threw away the
prisoner's Islamic study materials. On a third
date, another correctional officer allegedly took
the prisoner's Islamic materials away during a
search. The prisoner alleged that those three
incidents interfered with his religious freedom
rights. U.S.C.A. Const.Amend. 1; Religious
Land Use and Institutionalized Persons Act of
2000, § 3, 42 U.S.C.A. § 2000cc–1; 42 U.S.C.A.
§ 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Leon Eugene Morris, Represa, CA, pro se.

**ORDER OF SERVICE AND PARTIAL DISMISSAL**

SUSAN ILLSTON, District Judge.

**INTRODUCTION**

 **\*1**  Leon Eugene Morris, an inmate at Folsom State Prison,
filed a *pro se* civil rights action under 42 U.S.C. § 1983. The
court reviewed his original complaint and dismissed it with
leave to amend. Morris' amended complaint is now before
the court for review under 28 U.S.C. § 1915A. His second
motion for appointment of counsel and his motion for leave
to proceed in *forma pauperis* also are before the court for
consideration.

**BACKGROUND**

The original 36–page complaint covered a wide variety
of prison conditions at Folsom State Prison and Salinas
Valley State Prison. The court dismissed the complaint
with leave to amend, and gave detailed explanations of
various problems that needed to be remedied in the amended
complaint. Among other things, the court explained that the
complaint had improperly joined unrelated defendants and
claims, and gave the following instructions for amending to
deal with the joinder problems: "In his amended complaint,
Morris may only allege claims that (a) arise out of the
same transaction, occurrence, or series of transactions or
occurrences and (b) present questions of law or fact common
to all defendants named therein. The bottom line is that Morris
cannot complain in his amended complaint about *everything*
during his imprisonment. Morris needs to choose what claims
he wants to pursue that meet the joinder requirements.
This is an important consideration for Morris because if he
asserts improperly joined claims in his amended complaint,
the court will dismiss the improperly joined claims." Order
Of Dismissal With Leave To Amend, p. 3. That guidance
apparently fell on deaf ears. The amended complaint has
many unrelated claims against many different defendants.
In the amended complaint, Morris asserts religious freedom
claims against three defendants (claim 1), as well as claims
against other defendants for the use of excessive force (claim
2), denial of right of access to the courts (claim 3), deliberate
indifference to his medical needs (claim 4), due process
violations in disciplinary proceedings (claim 5), violations of
his right to be free from cruel and unusual punishment (claims

6 and 8), delay or denial of his mail (claim 7), and retaliatory searches (claim 9). Only the first will proceed, so only it will be further described.

Morris alleges several violations of his right to religious freedom. Amended Complaint, p. 3. In March 2005, sergeant Mercado allegedly denied Morris his Quran. In November 2004 or June 2005—the pleading is unclear on the date— correctional officer G. Bailey allegedly threw away Morris' Islamic study materials. In June 2005, correctional officer T. Robinson allegedly took Morris' Islamic materials away during a search. Morris alleges that these three incidents interfered with his religious freedom rights. *See* Amended Complaint, p. 3.

### DISCUSSION

#### A. *Review of Amended Complaint*
A federal court must engage in a preliminary screening of any case in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity. *See* 28 U.S.C. § 1915A(a). The court must identify any cognizable claims, and dismiss any claims which are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1), (2).

**\*2** To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the violation was committed by a person acting under the color of state law. *See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

In order to establish a violation of the Free Exercise Clause of the First Amendment's right to freedom of religion, a prisoner must show a defendant burdened the practice of his religion without any justification reasonably related to legitimate penological interests. *See Shakur v. Schriro,* 514 F.3d 878, 883–84 (9th Cir.2008). For a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc–1, the plaintiff-prisoner must show that the government has imposed a substantial burden on his religious exercise. Construing the allegations of the *pro se* pleading liberally, as the court must, it appears that Morris has stated a cognizable claim under the First Amendment and under RLUIPA based on the denial and confiscation of his Quran and other Islamic study and prayer materials. Morris has

adequately linked defendants Mercado, Bailey and Robinson to this claim. He may serve process on them.

The other claims (i.e., claims 2–9, at pages 4–17 of the Amended Complaint) are dismissed because they are not properly joined under Federal Rule of Civil Procedure 20(a) concerning joinder of claims and defendants. Federal Rule of Civil Procedure 20(a) provides that all persons may be joined in one action as defendants if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action." Fed.R.Civ.P. 20(a)(2). The acts or omissions giving rise to claims 2–9 were not part of the same transaction, occurrence or series of transactions or occurrences that gave rise to claim 1 for violations of religious freedoms. Also, claims 2–9 are against a different set of defendants. These claims are dismissed because they do not (a) arise out of the same transaction, occurrence, or series of transactions or occurrences and (b) present questions of law or fact common to all defendants. The dismissal of the improperly joined claims and parties means only that they cannot be pursued in this action—Morris is free to file new actions in which he asserts those claims against those parties.

#### B. *Miscellaneous Matters*
Morris filed a second motion for appointment of counsel that differs from his first motion only in that it has a different date. A district court has the discretion under 28 U.S.C. § 1915(e) (1) to designate counsel to represent an indigent civil litigant in exceptional circumstances. *See Wilborn v. Escalderon,* 789 F.2d 1328, 1331 (9th Cir.1986). This requires an evaluation of both the likelihood of success on the merits and the ability of the plaintiff to articulate his claims *pro se* in light of the complexity of the legal issues involved. *See id.* Neither of these factors is dispositive and both must be viewed together before deciding on a request for counsel under section 1915(e) (1). At this stage, the court is unable to see that appointment of counsel is necessary in this case. Accordingly, the second motion for appointment of counsel is DENIED.

**\*3** Morris filed a motion for leave to proceed *in forma pauperis* after the court explained in its Order Of Dismissal With Leave To Amend, p. 4, that he would have to serve process in this action. The motion is denied as unnecessary because he already paid the full filing fee when he filed this action. The motion also is denied because it is incomplete in that it does not have the necessary certificate of funds and

copy of the inmate trust account statement. Further, Morris is subject to the frequent filer limitation of 28 U.S.C. § 1915(g), which in general prohibits a prisoner-plaintiff from proceeding as a pauper after he has filed three or more actions that have been dismissed for failure to state a claim upon which relief may be granted, or are frivolous or malicious. *See* Order Of Dismissal in *Morris v. Woodford,* No. C 07–4198 MJJ. [1] For each of these reasons, Morris' motion to proceed as a pauper is DENIED.

## CONCLUSION

For the foregoing reasons,

1. The amended complaint states cognizable claims against defendants Mercado, Bailey and Robinson for violations of Morris' religious freedom rights under the First Amendment and RLUIPA. All other claims and defendants are dismissed without prejudice.

2. The clerk shall issue a summons for each of the three defendants (i.e., sergeant Mercado, correctional officer G. Bailey, and correctional officer T. Robinson), all of whom apparently work at Salinas Valley State Prison. The clerk shall send those summonses to plaintiff for his use in service of process.

3. Morris is responsible for serving the summons and amended complaint on each defendant because he has not been granted leave to proceed as a pauper. The court will not serve process for him, nor will it order the U.S. Marshal to do it. No later than **January 29, 2010,** Morris must (1) file proofs of service showing that he has served the summons and amended complaint on each of the three defendants in the religious freedom claims or (2) show cause why this action should not be dismissed for failure to serve process within 120 days of the filing of the complaint. *See* Fed.R.Civ.P. 4(l)-

(m). Once Morris tends to serving process on the defendants, the court will set a briefing schedule for dispositive motions.

4. All communications by plaintiff with the court must be served on a defendant's counsel by mailing a true copy of the document to defendant's counsel. The court may disregard any document which a party files but fails to send a copy of to his opponent. Until a defendant's counsel has been designated, plaintiff may mail a true copy of the document directly to defendant, but once a defendant is represented by counsel, all documents must be mailed to counsel rather than directly to that defendant.

5. Discovery may be taken in accordance with the Federal Rules of Civil Procedure. No further court order under Federal Rule of Civil Procedure 30(a)(2) or Local Rule 16 is required before the parties may conduct discovery.

**\*4** 6. Plaintiff is responsible for prosecuting this case. Plaintiff must promptly keep the court informed of any change of address and must comply with the court's orders in a timely fashion. Failure to do so may result in the dismissal of this action for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b).

7. Plaintiff is cautioned that he must include the case name and case number for this case on any document he submits to this court for consideration in this case.

8. Plaintiff's second motion for appointment of counsel and his application to proceed *in forma pauperis* are DENIED. (Docket # 3, # 4.)

IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2009 WL 3925267

Footnotes

1    In that 2007action, Morris challenged the application of § 1915(g) to him. The order of dismissal rejected his challenges, and his appeal from the order of dismissal was itself dismissed.

---

                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**WestlawNext** © 2015 Thomson Reuters. No claim to original U.S. Government Works.    3

2008 WL 1912910
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas,
Tyler Division.

David L. SHAW,
v.
Karen NORMAN, et al.

Civil Action No. 6:07cv443.   |   April 28, 2008.

**Attorneys and Law Firms**

David L. Shaw, Amarillo, TX, pro se.

### *MEMORANDUM OPINION AND ORDER OF PARTIAL DISMISSAL*

JOHN D. LOVE, United States Magistrate Judge.

**\*1** Plaintiff David L. Shaw, a prisoner previously confined at the Beto Unit of the Texas prison system, proceeding *pro se* and *in forma pauperis,* filed the above-styled and numbered civil rights lawsuit pursuant to 42 U.S.C. § 1983. The complaint was referred to the undersigned by consent of the parties pursuant to 28 U.S.C. § 636(c).

### *Facts of the Case*

The original complaint was filed on September 17, 2007. The Plaintiff complained about the destruction of his property, including legal and religious property. He also complained about Chaplain Kiser removing him from the Ramadan list. On April 4, 2008, the Court conducted an evidentiary hearing, in accordance with *Spears v. McCotter,* 766 F.2d 179 (5th Cir.1985), to consider the Plaintiff's claims. The hearing was conducted "to dig beneath the conclusional allegations; to reduce the level of abstraction upon which the claims rest; to ascertain exactly what scenario the prisoner claims occurred, as well as the legal basis for the claim." *Id.* at 180. The hearing is "in the nature of a motion for more definite statement." *Id.* at 180–181. The Plaintiff testified as to the factual basis of his claims. Regional Grievance Coordinator Chip Satterwhite and Warden Sloan were present during the hearing in the event the Court wanted testimony about

information contained in the Plaintiff's records or practices in the prison system.

The Plaintiff testified that Officer Black inventoried his property on January 2, 2006. She did not confiscate any of his property. On June 29, 2006, Officers Karen Norman and Sherri Milligan confiscated significant portions of his property during another search. They took his legal papers. They took religious items, including his Koran, prayer rug and beads. He testified that they confiscated pictures of his family, including members of his family who had recently died. The property was subsequently destroyed. He noted that the pictures were the only items he had left to remind him of his family. His only comfort in prison is his religion, and his religious items were taken. He testified that he could not say his prayers without his prayer rug and beads. Chaplain Kiser also removed him from the Ramadan list. All of this made him depressed and lose focus. He was sent to a psychiatric unit for 45 days and eventually transferred to the Clements Unit.

The Plaintiff testified that he has a thirty year sentence and has been confined for 15 years. He stated that he was harmed by the confiscation of his legal property in that he was unable to challenge his conviction. He had filed a petition for a writ of habeas corpus in federal court, which was denied. He wanted to file an appeal, but was unable to do so.

The Plaintiff testified that Property Officers Karen Norman and Sherri Milligan were the ones who actually confiscated his property. At the time of the search, he was the last person to show up with his property. He noted that he had collected a lot of property over 15 years. Norman and Milligan became angry at him for being slow, thus they just took his property. An inmate at the Bill Clements Unit gave him another copy of the Koran, but he had to go without it for about four months.

**\*2** Warden Sloan testified under oath that Muslim inmates are normally permitted to have a copy of the Koran and a prayer rug.

### *Discussion and Analysis*

The first issue for the Court's consideration is the confiscation of the Plaintiff's property. A state actor's negligent or intentional deprivation of a plaintiff's property does not result in a violation of procedural due process rights if there exists an adequate state post-deprivation remedy. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d

393 (1984) (intentional conduct); *Parratt v. Taylor,* 451 U.S. 527, 535–55, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (negligent conduct); *Simmons v. Poppell,* 837 F.2d 1243, 1244 (5th Cir.1988); *Marshall v. Norwood,* 741 F.2d 761, 764 (5th Cir.1984). The Texas court system provides an adequate post-deprivation remedy for the taking of any property. *See Holloway v. Walker,* 784 F.2d 1287, 1292 (5th Cir.1986). Moreover, the Texas state administrative and judicial systems provide an adequate state post-deprivation remedy for property taken from prisoners. *See* Tex. Gov.Code § 501.007. *Thompson v. Steele,* 709 F.2d 381, 382 (5th Cir.1983), *cert. denied,* 464 U.S. 897, 104 S.Ct. 248, 78 L.Ed.2d 236 (1983); *Loftin v. Thomas,* 681 F.2d 364, 365 (5th Cir.1982). Because Texas has adequate post-deprivation remedies, a prisoner does not have a basis for a § 1983 claim for the confiscation of his property. *Murphy v. Collins,* 26 F.3d 541, 543 (5th Cir.1994). The Plaintiff's claims that focus solely on the confiscation of his property fail to state a claim upon which relief may be granted and are frivolous in that they lack any basis in law and fact. Such claims should be dismissed pursuant to 28 U.S .C. § 1915A(b)(1). The Court sympathizes with the Plaintiff over the confiscation and destruction of the pictures of his family, but claims about the loss of such property must be presented in state court, as opposed to federal court.

On the other hand, the confiscation and destruction of specific types of property may give rise to potentially meritorious civil rights claims. For example, the destruction of his legal property may provide a basis for a meritorious denial of access to court claim. Prisoners are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental rights to the courts." *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Prison officials may not abridge or impair an inmate's right of access to court. *See Ex parte Hull,* 312 U.S. 546, 549, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); *Johnson v. Avery,* 393 U.S. 483, 486, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). "While the precise contours of a prisoner's right of access to court remain obscure, the Supreme Court has not extended this right to encompass more than the ability of an inmate to prepare and transmit a necessary legal document to a court." *Brewer v. Wilkinson,* 3 F.3d 816, 821 (5th Cir.1993). The Supreme Court has held that the right of meaningful access to court imposes a duty on prison officials to provide indigent inmates with either an adequate law library or adequate assistance from persons trained in the law. *Bounds v. Smith,* 430 U.S. at 828. The Texas prison system provides both attorneys and law libraries. The parameters of the prison system's access

to court plan has been defined in conjunction with the *Ruiz* litigation.

**\*3** To prevail on a claim that his right of access to court has been violated, a prisoner must demonstrate prejudice or harm by showing that his ability to pursue a "nonfrivolous," "arguable" legal claim was hindered by the defendants' actions. *See Christopher v. Harbury,* 536 U.S. 403, 415, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (internal quotations omitted); *Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). *See also Johnson v. Rodriguez,* 110 F.3d 299, 311 (5th Cir.1997). He must identify the nonfrivolous, arguable underlying claim. *Id.*

The Plaintiff testified that he wanted to challenge his conviction, and he wanted to file an appeal from the denial of his federal petition for a writ of habeas corpus. The problem here is that the Plaintiff has not identified claims with arguable merit that he wanted to bring in a petition for a writ of habeas corpus. Moreover, he testified that he has served 15 years of a 30 year sentence. Such testimony makes it probable that any petition for a writ of habeas corpus filed by him in recent years would be barred by the one year statute of limitations. The records of the Eastern District of Texas reveal that, in 2002, the Plaintiff filed a petition for a writ of habeas corpus challenging his conviction in Civil Action No. 1:02cv336. He challenged his 1994 conviction for aggravated possession of a controlled substance. On August 14, 2002, United States District Judge Thad Heartfield dismissed the petition as time-barred. The Fifth Circuit dismissed his appeal on October 24, 2002. By the time of the search in this case in 2006, the deadlines for him to file a petition for a writ of certiorari from the Fifth Circuit's decision or to file any other challenges to his conviction in federal court had expired. The Petitioner has not shown any harm from the confiscation and destruction of his legal materials, and the Court does not see how he could satisfy this requirement. Consequently, any potential denial of access to court claim he may have fails to state a claim upon which relief may be granted and is frivolous in that it lacks any basis in law and fact. The denial of access to court claim should be dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

The final possible claim raised by the facts of this case concerns the denial of the Plaintiff's religious rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). The Plaintiff has alleged facts supporting an inference that Property Officers Norman and Milligan substantially burdened his religious

exercise by taking and destroying his religious property, while Chaplain Kiser substantially burdened his religious exercise by removing his name from a list of inmates that observed Ramadan. *See* 42 U.S.C. § 2000cc–1. It is noted that a contributing factor in Congress passing RLUIPA was a concern that prison officials frequently treated the Koran and other religious items in contempt and confiscated such items from inmates. *Cutter v. Wilkinson,* 544 U.S. 709, 717 n. 5, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). Since the Plaintiff has shown that the Defendants substantially burdened the exercise of his religious beliefs, the Defendants must show that their actions furthered "a compelling governmental interest" and did so by "the least restrictive means." *Id.* at 715. Defendants Norman, Milligan and Kiser should be ordered to respond to the Plaintiff's claims and explain whether their actions furthered a compelling governmental interest and did so by the least restrictive means. It is accordingly

 **\*4 ORDERED** that the Plaintiff may proceed with his First Amendment and RLUIPA claims against Karen Norman, Sherri Milligan and Chaplain Kiser. It is further

**ORDERED** that the Plaintiff's remaining claims are **DISMISSED** with prejudice pursuant to 28 U.S.C. § 1915A(b)(1).

**So ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 1912910

---

  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1137644
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Deandre WILLIAMS, Plaintiff,
v.
Brian FISHER, Cheryl V. Morris, Omega
B. Albton, D. Rock, M. Lira, J. Hawk,
Don Haug, Karen Bellamy, Kenneth S.
Perlman, Alec H. Friedmann, Defendants.

No. 9:11–CV–379 (NAM/TWD).  |  Signed
March 10, 2015.  |  Filed March 11, 2015.

**Attorneys and Law Firms**

DeAndre Williams, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of
New York, Keith J. Starlin, Esq., Assistant New York State
Attorney, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

 **\*1**  In this *pro se* action pursuant to 42 U.S.C. § 1983,
plaintiff alleges violations of his First Amendment right to
practice his chosen religion, his Eighth Amendment right
to be free from cruel and unusual punishment, and his
Fourteenth amendment right to equal protection under the
law. In addition, the Court reads his complaint as alleging
violations of the Religious Land Use and Institutionalized
Person Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*
Plaintiff bases his claims on defendants' alleged refusal to
acknowledge his faith as a Nazarite Jew and failure to
provide him with a sufficiently nutritious alternative diet in
accordance with the dietary laws of his faith.

Defendants move (Dkt. No. 113) to revoke plaintiff's
preliminary *in forma pauperis* status under 28 U.S.C. §
1915(g) and for summary judgment under Fed.R.Civ.P.
56. Upon referral, United States Magistrate Judge Therese
Wiley Dancks issued a thorough Order and Report
and Recommendation recommending summary judgment
dismissing the action in its entirety. Defendant objects.
Therefore, the Court reviews the matter *de novo. See*

28 U.S.C. § 636(b)(1). Defendant also requests appointed
counsel.

Appointment of counsel is not warranted. There is no
requirement that the Court appoint counsel for an indigent
litigant in a civil matter. *See Burgos v. Hopkins,* 14 F.3d 787,
789 (2d Cir.1994); 28 U.S.C. § 1915(e). In deciding whether
to exercise its discretion to appoint counsel, a court must first
determine "whether the indigent's position seems likely to
be of substance." *Hodge v. Police Officers,* 802 F.2d 58, 61
(2d Cir.1986). If the case appears to have some merit, the
court should consider other factors including "the plaintiff's
ability to gather the facts and deal with the issues if unassisted
by counsel." *Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170,
172 (2d Cir.1989). Here, this Court agrees with Magistrate
Judge Dancks that the case lacks merit. In addition, plaintiff
has adequately advanced his claims, and there is no reason
to believe that if counsel were appointed the outcome of
defendants' summary judgment motion would be different.
Appointment of counsel is denied.

Upon *de novo* review of the substantive issues, the Court
agrees with Magistrate Judge Dancks that, affording plaintiff
all the solicitude to which he is entitled as a *pro se*
litigant, resolving all ambiguities and drawing all factual
inferences in his favor, and interpreting his submissions to
raise the strongest arguments that they suggest, there is no
genuine issue of material fact; thus, defendants are entitled
to summary judgment as a matter of law. *See Celotex Corp.
v. Catrett, All* U.S. 317, 322 (1986); *Treistman v. Federal
Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006).

Defendant also moves (Dkt. No. 132) for a preliminary
injunction. He claims that on January 7, 2015 he was
transferred to Five Points Correctional Facility, where he is
not receiving proper meals, eating utensils, or medications.
Such issues are not the subject of this lawsuit and are not
properly before the Court. The preliminary injunction motion
is denied.

 **\*2**  It is therefore

ORDERED that the Order and Report and Recommendation
of United States Magistrate Judge Therese Wiley Dancks
(Dkt. No. 129) is adopted and accepted; and it is further

ORDERED that defendants' motion for summary judgment
(Dkt. No. 113) is granted and the case is dismissed with
prejudice; and it is further

ORDERED that plaintiff's motion for a preliminary injunction (Dkt. No. 132) is denied.

IT IS SO ORDERED.

### ORDER AND REPORT AND RECOMMENDATION

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

In this *pro se* civil rights action commenced under 42 U.S.C. § 1983, [1] Plaintiff DeAndre Williams claims that Defendants violated his First Amendment right to practice his chosen religion, his Eighth Amendment right to be free from cruel and unusual punishment, and his Fourteenth amendment right to equal protection under the law. (Dkt. No. 1 at ¶¶ 6 and 7.) Plaintiff's Complaint has also been construed to allege violations of the Religious Land Use and Institutionalized Person Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* [2] Plaintiff's claims all arise out of Defendants' alleged deliberate refusal to acknowledge his faith as a Nazarite Jew and failure to provide him with a sufficiently nutritious alternative diet in accordance with the dietary laws of his faith. (*See generally* Dkt. No. 1.) Defendants, all named in their official and individual capacities, *id.* at ¶ 140, are Brian Fischer, Commissioner of the Department of Corrections and Community Supervision ("DOCCS"); Cheryl V. Morris, DOCCS Director of Ministerial, Family, and Volunteer Services; Omega B. Alston, incorrectly sued as Omega B. Albton, DOCCS Assistant Director, Ministerial, Family and Volunteer Services; D. Rock, Superintendent at Upstate Correctional Facility ("Upstate"); M. Lira, Deputy Superintendent at Upstate; Timothy Hawk (incorrectly sued as J. Hawk), Chaplain at Upstate; Don Haug, Food Administrator at Upstate; Karen Bellamy, DOCCS Director, Inmate Grievance Program; Kenneth S. Perlman, DOCCS Deputy Commissioner of Program Services; and Alec H. Friedmann, Jewish Chaplain at Upstate Correctional Facility. *Id.* at ¶ 2 and 3–4. [3] Plaintiff seeks both monetary and injunctive relief. *Id.* at 8.

Presently before the Court is Defendants' motion seeking the revocation of Plaintiff's preliminary *in forma pauperis* status under 28 U.S.C. § 1915(g) and for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 113.) Plaintiff has opposed the motion. (Dkt. No. 118.) For reasons explained below, the Court recommends that

Defendants' motion for summary judgment be granted, and their request for revocation of Plaintiff's preliminary *in forma pauperis* status be denied as moot.

## I. FACTUAL BACKGROUND

### A. Plaintiff's Religious Beliefs and Practices

At all times relevant to the claims asserted in his Complaint, Plaintiff was an inmate confined in the Special Housing Unit ("SHU") at Upstate. (Dkt. No 1 at ¶ 2.) He professes to be a Nazarite, which he describes as, in his case, a sect of the Jewish religion. *Id.* at ¶ 6; Dkt. No. 113–3 at 20–21. Plaintiff believes in the "most high creator," whom he calls Yahweh. (Dkt. No. 113–3 at 69.) According to Plaintiff, he and other Nazarites in the DOCCS system are not under the teachings of rabbis or priests but are teachers unto themselves and take orders directly from God. *Id.* at 22–23, 27.

**\*3** Plaintiff's parents and sister are also Nazarites, as was his brother until his passing. *Id.* at 30. Plaintiff initially took the vows of abstinence as a Nazarite Jew in 1986. *Id.* at 30. He has described the vow taken by him as a Nazarite as prohibiting him from eating fruit from the grape vine, from touching or eating anything dead, including animals, and requiring that he grow his hair long and not comb it. *Id.* at 13, 15–16. Plaintiff broke the vow in 1996 but took it again before he entered prison and claims that he has been continuously under it since that time. *Id* . at 30. According to Plaintiff, the permanence of the vow depends upon the person whatever he or she can offer to the Most High. *Id.* at 17. Plaintiff believes his vow will be life-long unless he violates it. *Id.* at 83.

Plaintiff has been largely a vegetarian since about 1976, and a vegan since he took the Nazarite vow before being imprisoned. *Id.* at 13–14, 83. In addition to refraining from eating meat, fish, and foods that come from the grape vine, Plaintiff does not have milk products because he is either allergic to dairy or lactose intolerant. *Id.* at 23–24, 52; Dkt. No. 313–4 at 6–7. Plaintiff also refrains from eating eggs. *Id* at 52. Plaintiff claims he has not violated his dietary vow since being imprisoned. *Id.* at 87.

According to Plaintiff, at some point in 2001 or 2002, he informed the Rabbi at Upstate that he followed the Torah, which Plaintiff believes recognizes the Nazarites. (Dkt. No. 1 at ¶ 9.) In February of 2003, Plaintiff learned of the International Prison Yeshiva Jewish Outreach Congregation ("Prison Yeshiva") and began corresponding with the Director, Rabbi Jacob Feinberg ("Rabbi Feinberg"

or "Feinberg"). *Id.* at ¶ 13 and 35. Plaintiff became an official member of the Prison Yeshiva in October of 2004 and thereafter engaged in regular correspondence with Feinberg about religious matters.[4] *Id.* at 35. The Prison Yeshiva is described in an undated letter from Feinberg to "Dear Chaplin" in which he identified himself as Rabbi at Congregation Bet Shalom Israel in Norman, Oklahoma, and director of the Congregation's Jewish Outreach Organization, "The Prison Yeshiva."[5] *Id.* at 35; Dkt. No. 113–4 at 21. According to Rabbi Feinberg, the Prison Yeshiva was composed of incarcerated men and women studying to convert to the Jewish faith. *Id.* Feinberg wrote that he had been engaged in outreach to Jewish prisoners and serving their personal needs for over fifteen years, serving as personal religious and spiritual guide for over four hundred prisoners, giving them instruction in all facets of Jewish observance and overseeing conversions. *Id.*

In the "Dear Chaplin" letter, Feinberg wrote:

> David Williams # 99A0052 became an official member of The Prison Yeshiva on October 9th 2004. I have been in regular correspondence with him, advising him on religious matters. In this time he has demonstrated to me his understanding of Jewish beliefs and dedication to Jewish practice. David has shown progress in his study of Jewish scriptures, including completing regularly the Correspondence Course lessons that I have sent to him and passing my examinations with excellent marks. It is obvious he is sincerely trying to follow the statutes and teachings of Judaism, and I fully support and endorse all of the requests that he is making.[6]

**\*4** *Id.* In an undated and unauthenticated "to whom it may concern" letter, Feinberg wrote that plaintiff had taken a number of correspondence courses with him, and during his studies, Plaintiff had said nothing that had led him to believe other than that he had taken the Nazarite vow. *Id.* at 37. He wrote that Plaintiff "abstains from anything that grows from the fruit of the vine, does not cut his hair, and states that he is a vegetarian and will not eat meat of any kind or type." *Id.* According to Feinberg, his courses were designed to weed out

those who were not really trying to convert to Judaism but only trying to get extra food or days off or not cut their hair or shave. *Id.* Plaintiff claims he sent copies of Feinberg's letters to "everybody" so they could see he was asking for help. (Dkt. 113–3 at 61–62.)

When Defendant Alec H. Friedmann ("Rabbi Friedmann" or "Friedmann"), Rabbi at Upstate during Plaintiff's incarceration there, informed Plaintiff he was his Rabbi, Plaintiff responded that he was not. *Id.* at 26. According to Plaintiff, Rabbi means master and teacher, and it is a personal relationship. *Id.* Plaintiff explained that whereas Rabbi Friedmann would talk and laugh with the white inmates and provide them with religious books, he had done nothing to teach Plaintiff or try to help him with his religion. *Id.* at 25–26. Plaintiff claims that when he told Friedmann he was not his Rabbi, Friedmann responded by calling Plaintiff a "nigger." *Id.* at 26. Friedmann has denied doing so, but has acknowledged he has not played a role as Plaintiff's Rabbi since Plaintiff explicitly rejected him for that role. (Dkt. No. 113–4 at 59–60.) Plaintiff claims that people at Upstate showed him disrespect by saying that his religion was not recognized. *Id* . at 69–70. Plaintiff also believes that he was prejudiced against because he is Black. *Id.* at 70.

According to Defendant Cheryl V. Morris ("Morris"), DOCCS Director of Ministerial, Family, and Volunteer Services ("Ministerial Services"), Plaintiff has written to Ministerial Services on several occasions asking that his religion as a Nazarite Jew be recognized by DOCCS. (Dkt. No. 113–9 at ¶ 4.) Morris has explained in her Declaration that DOCCS would have to contact and consult with a reliable religious resource or clergy person outside of DOCCS, who could advise them of the requirements for the Nazarite Jewish religion and how DOCCS could appropriately accommodate the religion within the confines of a correctional institution. *Id.; see also* DOCCS Directive # 4202, as revised 10/07/2009[7] ("Directive # 4202") (Dkt. 113–10 at 10.)

Plaintiff was also advised of the requirement for consultation with a reliable religious resource by now retired Deputy Commissioner of Program Services, Defendant Kenneth S. Perlman ("Perlman"), and Defendant Omega B. Alston ("Alston"), retired DOCCS Assistant Director of Ministerial Services. (Dkt. Nos. 113–9 at ¶ 5; 113–10 at 23, 29, 32.) In a December 16, 2010, letter to Plaintiff, Perlman, to whom Defendant Brian Fischer ("Fischer") had referred a letter from Plaintiff complaining of denial of his religious rights, wrote:

**\*5** In order to provide you with an advisor to assist you in meeting your spiritual needs, Department Directive # 4202, *Religious Programs and Practices,* states clearly, "For religions not represented by certified Chaplains, the Department will seek advice on matters of religious doctrine, practice, and tradition from recognized religious authorities in the outside community." Therefore, to best accommodate your religious practices as a Nazarite of the Jewish Faith, please write to your religious mentor and ask him to write directly to the Division of Ministerial, Family and Volunteer Services to potentially become a volunteer.

(Dkt. No. 113–10 at 23.)

Plaintiff provided Ministerial Services with Rabbi Feinberg's name. (Dkt. No. 113–9 at ¶ 6.) However, when Ministerial Services attempted to contact Feinberg, they were advised that he was deceased. *Id.* According to Morris, no other outside resources for the Nazarite Jewish faith have come forward. *Id.*

Defendants have submitted the Declaration of Rabbi Joseph Potasnik ("Rabbi Potasnik" or "Potasnik"), Executive Vice President of the New York Board of Rabbis, in support of their motion. (Dkt. No. 113–11.) Rabbi Potasnik, who advises and assists DOCCS on issues implicating the Jewish faith and the potential administrative implications of various religious practices, has made his Declaration based upon his familiarity with Jewish dietary laws. *Id.* at ¶¶ 2–3. Potasnik states that a Nazarite vow can technically be of any religion, that it is a personal choice, and that he has no cause to question Plaintiff's sincere beliefs. *Id.* at ¶ 5. However, he notes that the Nazarite vow is discouraged by most modern day Jewish scholars and societies and prohibited by others. *Id.* Potasnik describes the primary restrictions on a person taking the Nazarite vow as: (1) not cutting his hair; (2) not drinking wine; and (3) not coming into contact with dead bodies. *Id.* at ¶ 6. He opines that the prohibition against coming into contact with dead bodies derives from the book of Numbers, chapter 6, and applies only to human corpses. *Id.* ¶ 7. Under Jewish law, it does not apply to animals, particularly those slaughtered in accordance with Jewish Dietary Laws, and members of the Jewish faith are not required to abstain from meat and become vegetarians. *Id.* at ¶¶ 7, 22, 23.

According to Rabbi Potasnik, DOCCS prisoners who wish to maintain a kosher diet may eat the Cold Alternative Diet ("CAD"), which has been approved as kosher because the meats and other animal products served have been prepared in accordance with Jewish Dietary Laws. *Id.* at ¶ 15. Inmates whose religion prohibits them from eating meat or flesh can choose the meatless alternative entrees on the general confinement menu. *Id.* at ¶ 21.

**B. Upstate's Alleged Failure to Accommodate Plaintiff's Right to Receive a Die t Consistent with his Sincerely Held Religious Beliefs**

**\*6** Plaintiff was housed in Clinton Correctional Facility ("Clinton") before being moved to Upstate. *Id.* at 42. According to Plaintiff, while he was at Clinton, the same Rabbi as at Upstate helped him receive a Rastafarian diet of rice or beans, vegetables, and fruit. [8] *Id.* at 42, 50. When Plaintiff was moved to Upstate he expressed a desire to properly follow his religion of Judaism and contends there were no problems until he refused to accept Rabbi Friedmann as his Rabbi. *Id.*

According to Plaintiff, he has been provided with the CAD since approximately March of 2002, in accordance with the Upstate policy of providing the CAD to Jewish inmates because it contains Kosher items. [9] (Dkt. Nos. 1 at ¶¶ 18–19; 113–3 at 43–44.) Plaintiff has described the typical breakfast under the CAD diet includes alternating hot and cold cereal, along with bread, and eggs or peanut butter, juice, and coffee. (Dkt. No. 1 at 36.) Lunch typically consists of tuna, peanut butter or cheese, bread, vegetable, and on some days macaroni salad and fruit. *Id.* Dinner is some type of meat or fish, bread, vegetable, and soup. [10] *Id.* Because of his religious dietary restrictions, Plaintiff is unable to drink the grape juice served as part of the CAD diet and cannot eat the macaroni salad, which has vinegar. [11] He is also unable to eat the meat, fish, and cheese served at lunch and dinner. *Id.* at ¶¶ 45–46, and 26; Dkt. No. 113–3 at 50. The CAD diet meals are repeated week after week without change. (Dkt. No. 1 at ¶ 22.) Since no substitute for milk is provided at breakfast, Plaintiff has to eat the cereal dry. (Dkt. No. 113–3 at 54.) Plaintiff also claims that he was unable to use the alleged kosher hot water for his hot cereal at Upstate because was it heated in the area of the building used to store mops, brooms, and other cleaning supplies, rendering it non-kosher and unsanitary. (Dkt. No. 1 at ¶¶ 30–34.)

Plaintiff has alleged in his Complaint that in about October of 2003, he began complaining to Defendants that the CAD was in contravention of the dietary laws of the Nazarite Jewish faith, and that he could not eat enough of the food being served to him to sustain him in good health. (Dkt. No. 1 at

¶¶ 39–40.) Since Plaintiff was not allowed the CAD diet until mid–2004 at the earliest, his complaints could not have begun until then. Plaintiff continued to complain over time and to request that an alternative be provided to him to supplement for the meat and dairy products he could not eat because of his religious beliefs and dairy allergy/intolerance. *Id.* at ¶ 43.

At various times in 2010, Plaintiff complained to the mess hall supervisors and requested that they stop putting salmon on his plate. *Id.* at ¶¶ 44–45; Dkt. No. 113–3 at 99–100; Dkt. No. 113–4 at 28. Plaintiff claims that the contamination of other food on his plate from the salmon juice made him nauseous and forced him to eat fruits and vegetables given to him by other prisoners or go hungry. (Dkt. Nos. 1 at ¶¶ 48–49; 113–3 at 50.) He contends his complaints were disregarded. (Dkt. No. 1 at ¶ 55 and 38.) Plaintiff also suggested solutions such as giving him hot cereal or peanut butter and jelly instead of the food he could not eat. *Id.* at ¶¶ 89 and 91.

**\*7** From 2009 through 2011, Plaintiff filed a series of largely repetitive grievance complaints relating to his religious recognition and dietary concerns, all of which were denied. *Id.* at ¶¶ 60–62, 113 and 41–44, 49–51, 54–58, 63; *see also* Dkt. No. 113–4 at 3–17, 29–36, 42–49, 63–65, 72–78, 81, 85–88. In its August 18, 2009, decision on Plaintiff's Grievance No. UST–39897–09, grieving the failure by DOCCS to recognize the Nazarite Jewish faith and provide him with a nutritionally adequate diet that accommodated his religious beliefs, the Upstate Internal Grievance Resolution Committee ("IGRC") wrote:

In accordance with Directive # 4040, 701.5(d)(2)(ii): CORC decisions have the effect of directives. The CORC decision for UST–22390–05 states that it should be clearly understood that the Department takes no position "acknowledging" any particular religion within its inmate population. The department merely attempts to identify faiths within the inmate population in an effort to accommodate the legitimate spiritual needs of its inmates as reasonably as possible in a manner which is commensurate with its legitimate correctional interests and the safety and security of its respective facilities.

The CORC decision for CL–51228–05 states that CORC notes that inmates may refrain from eating those food items that are contrary to their religious beliefs.

The CORC decisions for A–43756–02 states that CORC asserts that the Department does not offer a vegetarian menu.

The grievant's religious designation is listed as Jewish since 7/26/04. As such, the grievant has requested and receives the Cold Alternative Diet as well as Grape Juice and Matzah crackers.

According to the Messhall, no substitutions are made to the CAD unless the inmate receiving it has an allergy to the items served. Then substitutions are made on a case by case basis.

The grievant is advised that any concerns he has regarding the CAD, or being removed from the CAD/Grape Juice & Matzah list, or his religious designation should be addressed directly to the Chaplain's Office. [12]

(Dkt. No. 113–4 at 47.)

The decision on the appeal to the superintendent of the denial of Plaintiff's October 14, 2010, Grievance No. UST–44053–10 requesting a nutritionally adequate diet accommodating his religious beliefs, stated in part that:

> The grievant receives a CAD (kosher) meal, the NYSDOCS does not have a vegetarian CAD (kosher) diet; they do have an alternative diet plan available. If grievant would like the alternative diet they must fill out the S–Block Meal form available on your housing unit.

(Dkt. No. 1 at 44.) According to Plaintiff, he could not have the alternative diet because it is not kosher and eating a kosher diet is a central tenet of Nazarite Judaism. *Id.* at ¶¶ 133–34. However, in a July 22, 2009, memorandum to the IGRC, Rabbi Friedmann wrote:

> Williams receives the Cold Alternative Diet, which meets all the standards for a 'Real kosher meal' and is nutritionally sound. He receives an adequate diet. However, he chooses to not eat many of the items which are provided. In the past I have suggested the Religious Alternative Menu which would solve most of his vegetarian problems. He has insisted that he want (sic) the Cold Alternative Diet.

**\*8** (Dkt.No. 113–4 at 59.)

The Central Office Review Committee ("CORC") also denied Plaintiff's October 14, 2010 grievance, writing in part:

> CORC notes that the grievant's dietary concerns were addressed in its prior decisions UST–39582–09 and UST–39897–09, dated 9/2/09 and 10/7/09, respectively. CORC also notes that the grievant's Religion of Record is designated as "Jewish", and that he is receiving the Cold Alternative Diet and grape juice and matzo. CORC asserts that the Department does not offer a vegetarian diet, and advises the grievant that he may refrain from eating those food items which are contrary to his religious beliefs. No approval has been granted to alter the CAD to accommodate Nazarites. CORC advises the grievant to address medical concerns via the sick call mechanism.

*Id.* at 50.

At his deposition, Plaintiff testified that all he had to eat on a daily basis at Upstate was a cup-a-soup, juice, fruits and vegetables served with his meals or traded for with other inmates, and bread, which he used to make "apple pies." (Dkt. No. 113–3 at 14, 33, 54–57, 60.) According to Plaintiff, requests for Ensure, which he was given at Clinton, were denied at Upstate. *Id.* at 59.

When Plaintiff commenced this action, and at the time of his deposition in November of 2013 (Dkt. No. 113–3), because he was being held in SHU, he was without the benefit of food from the commissary or food packages to supplement his diet to make up for the CAD diet food he was unable to eat because of his religious beliefs and his dairy allergy or intolerance. (Dkt. Nos. 1 at ¶ 17; 113–3 at 58.)

### C. Health Problems Claimed By Plaintiff to Have Resulted From An Inadequate Diet

Plaintiff has alleged that as a result of the lack of adequate nutrition, he has sustained significant weight loss, and his health has dramatically declined, with pre-existing illnesses exacerbated as his body is starved for the nutrients it needs. (Dkt. Nos. 1 at ¶ 137; 113–3 at 36.) Plaintiff also claims to

have contracted severe gum and sinus infections from dietary deficiencies, to suffer from stomach pains as a result of being starved, and to have been hospitalized on two occasions for stomach pains and internal bleeding because his health was failing due to malnutrition and an inadequate diet. (Dkt. No. 1 at ¶¶ 88, 99, and 111; 113–3 at 36–39.) Plaintiff contends that his request to see a dietician was denied. *Id.* at ¶ 112.

David Karandy, M.D. ("Karandy"), employed as a medical doctor with DOCCS and currently assigned to Great Meadow where Plaintiff is presently confined, performed a physical examination of Plaintiff on April 28, 2014. (Dkt. No. 113–7 at ¶¶ 2, 5.) Karandy's examination found Plaintiff to be in good health, with his vital signs normal. *Id.* at ¶¶ 6, 7. Plaintiff's weight was 130 pounds. *Id.* at ¶ 7. Based on his weight and measured height of $5'7.5''$, Plaintiff's Body Mass Index ("BMI") was calculated to be 20.1. *Id.* at ¶ 8. A BMI between 18.5 and 24.9 is considered normal; accordingly, Plaintiff is in what Karandy describes as "the healthy range and consistent with appropriate nutrition." *Id.* at ¶ 9. Plaintiff's total protein and albumin levels, determined by a blood test on June 22, 2013, were found in the normal range. *Id.* at ¶¶ 10–11. Plaintiff's normal blood levels were also found consistent with good nutrition. *Id.*

**\*9** Plaintiff's medical records reveal his weights during the time period from December 16, 2010, to March 28, 2011, as: December 16, 2010 weight 134 pounds; January 20, 2011 weight 134 pounds; February 7, 2011 weight 139 pounds; and March 28, 2011 weight 138 pounds. *Id.* at ¶ 13; Dkt. No 115 at 5–6, 8, 10. [13] Plaintiff's BMI during that time period ranged from 20.7 to 21.4, which, according to Karandy, is in the healthy range. *Id.* at ¶ 14. Plaintiff's recorded weights for the time period April 30, 2012, to March 13, 2013, were: April 30, 2012 151 pounds; August 22, 2012 145 pounds; September 13, 2012 145 pounds; November 29, 2012 148 pounds; February 13, 2013 148 pounds; March 3, 2013 145 pounds; March 10, 2013 145 pounds; and March 13, 2013 146 pounds. *Id.* at ¶ 15; Dkt. No. 15 at 12, 14, 15–19. Plaintiff's BMI during that time period ranged from 22.4 to 23.3, which according to Karandy was within the healthy range. *Id.* at ¶ 16. Plaintiff refused to be weighed by the staff on August 20, 2010, November 4, 2010, and August 13, 2012. *Id.* at ¶ 17. Karandy has opined that in his professional medical opinion, Plaintiff did not suffer from malnutrition and was not in imminent physical danger between December 10, 2010 and March 13, 2013, and is not currently suffering from malnutrition, nor is he currently in physical danger. *Id.* at ¶ 18.

Plaintiff's medical records reveal that on a number of occasions between November of 2010 and March of 2011, he complained of blood in his stool, abdominal pain and an upset stomach, and that he was prescribed medication for his upset stomach at various times from November of 2010 to March of 2011. (Dkt. No. 115 at 2, 4, 6–10.) However, Plaintiff refused to have a colonoscopy on more than one occasion during that time period. *Id.* at 8–10. In February of 2011, Plaintiff attributed his digestive system problems to Crohn's disease. *Id.* at 9. There is no evidence in the medical records contained in the summary judgment record supporting Plaintiff's conclusory assertion that his digestive system problems were related to his diet. There is also no evidence in the record supporting Plaintiff's claim of gum disease or sinus problems resulting from malnutrition.

**D. DOCCS Food Service**
The duties of Robert Schattinger ("Schattinger"), DOCCS Director of Correctional Food and Nutritional Services for the past five years, and a DOCCS employee for approximately twenty-five years, include the development of menus, overseeing the operation of the Food Production Center (FPC") located at the Mohawk Correctional Facility, training staff, and managing personnel issues. (Dkt. No. 113–8 at ¶¶ 2–3.) In his Declaration in support of Defendant's motion, non-party Schattinger sets forth reasons why he believes what he describes as the vegetarian kosher diet being requested by Plaintiff should not and cannot be accommodated by DOCCS. *Id.* at ¶ 4.

**\*10** According to Schattinger, the menus of specific food items provided to inmates at the DOCCS correctional facilities are not decided at the facility level but are solely designed and implemented by the DOCCS Central Office Department of Nutritional Services in consultation with nutritionists, including Schattinger, and other specialists. *Id.* at ¶ 5. The diets are designed to be nutritionally sufficient and varied, and absent an emergency, no facility level administrator, including the Superintendent, the Food Service Administrator, the Deputy Superintendent, or any of the facility Defendants, has the authority to alter or override the menus without prior approval of the Office of Nutritional Services, or create menus of their choosing.[14] *Id.* at ¶¶ 6, 11. The DOCCS Office of Nutritional Services falls under the Supervision of the Deputy Commissioner in charge of Administration and is responsible for providing all food services to inmates incarcerated at correctional facilities maintained by DOCCS. *Id.* at ¶ 7. The FPC produces the food

for all fifty-eight of DOCCS' general confinement facilities for meals provided to the general inmate population, as well as food used in the CAD and the hot kosher program at Green Haven Correctional Facility. *Id.* at ¶ 8. The correctional facilities house approximately 55,000 inmates. *Id.* at ¶ 9.

**1. *The General Confinement Menu***
The general confinement menu, a statewide menu prepared by the Office of Nutritional Services, has been served for breakfast, lunch, and dinner in each general confinement facility since the early 1990's. *Id.* at ¶ 10. In developing the general confinement menu, which contains an entree, side dishes, a beverage, and dessert with lunch and dinner, the Office of Nutritional Services has attempted to provide a variety of nutritious, palatable meals at a reasonable expense to taxpayers. *Id.* at ¶¶ 12–13.

**2. *The "Religious Alternative Menu"***
In the early 1990s, after instituting the general confinement menu, the Office of Nutritional Service began to look for reasonable means to accommodate dietary preferences for inmates who had food allergies, had religious objections to certain foods, or were vegetarians.[15] *Id.* at ¶ 16. In 1993, the Office of Nutritional Services determined that the best way to meet variable dietary preferences was to add a nutritionally adequate alternative entree, known as the "religious alternative menu," to the general confinement menu as a substitute for meals that contain a meat entree. *Id.* at ¶ 19. Schattinger explains that "religious alternative menu" ("RAM") is a misnomer because the alternative entree is available to all inmates who choose it. *Id.* at ¶ 20. It is not intended to be kosher or halal or compliant with any other religious dietary rules, and the name was recently changed to "alternative entree." *Id.* An alternative entree is available for each lunch and dinner that includes a meat entree, but not those meals where the lunch and dinner entrees are non-meat. *Id* at ¶ 24. Of the twenty-one meals fed to the general population during a seven-day cycle, on average, nineteen meals include an alternative meatless entree. *Id.* at ¶ 27.

**\*11** One alternative entree per week is halal chicken. *Id.* at ¶ 31. DOCCS considered making every alternative entree meatless but decided not to do so because the purpose of the program was not only to accommodate vegetarians but inmates who had religious objections to certain foods or had food allergies. *Id.* at ¶ 29. On the day that the alternative entree is chicken, an inmate who consumes just the side dishes, dessert, and a beverage, would receive enough food to satisfy

him or her. *Id.* at ¶ 37. According to Schattinger, catering to the dietary preferences of each inmate would pose an unreasonable financial burden on taxpayers and an impossible administrative burden on DOCCS. *Id.*

### 3. *The CAD*

Because with the exception of Green Haven, the DOCCS correctional facilities do not have kosher kitchens or facilities to prepare on-site kosher meals, Jewish inmates who request a kosher diet are served the CAD, which typically consists of a sandwich made with kosher meat or cheese, condiments, chips, a cookie or cake, and juice. *Id.* at ¶¶ 40–41. Some CAD items, including juices, salads, cold cuts and cheese, are prepared and packaged at the FPC in kosher compliant conditions, under rabbinical supervision. *Id* at ¶ 41.

### 4. *The Green Haven Program*

In the early 1980s, as an experimental pilot program, DOCCS built and began operating a kosher food service facility at Green Haven. *Id.* at ¶ 42. The menu, compiled by the Green Haven Food Administrator and Jewish Chaplain, is not vegetarian. *Id.* at ¶ 43. The menu parallels the menu offered to the general inmate population but contains no alternative to the meat entrees on the Green Haven hot kosher food menu. *Id.* DOCCS has learned from its experience with Green Haven that such an accommodation is extremely expensive and administratively burdensome. *Id.* at ¶ 44. Therefore, while DOCCS has chosen to maintain the kosher service at Green Haven, which is limited to Jewish inmates with good disciplinary records, it has determined that the service cannot be provided statewide.

### 5. *Considerations Regarding a Kosher Vegetarian Menu*

The CAD is not a vegetarian diet, and the meatless alternative entrees may or may not be kosher. *Id.* at ¶ 45. All fresh vegetables received by FPC are processed and used as ingredients in other dishes. *Id.* at ¶ 46. Although the FPC can prepare and package kosher food for inclusion in the CAD to a limited extent, because DOCCS' only kosher kitchens are at FPC and Green Haven, maintaining the integrity of kosher at the facility level is problematic. *Id.* at ¶ 47. Kosher vegetarian meals would have to be sealed in individual packets to keep the food safely preserved and transportable, requiring DOCCS to provide the FPC with new equipment. *Id.* at ¶ 49. Even if DOCCS had sufficient equipment, it would not be able to manage the production because the preparation and packaging of kosher vegetarian meals would require a

dedicated kosher production line, involving staff, work areas, and packaging equipment DOCCS does not currently have. *Id.* at ¶ 50.

**\*12** A kosher vegetarian menu would bring challenges beyond designating and providing a kosher vegetarian food line. For instance, a vegetarian kosher menu would have to provide adequate protein to fulfill the nutritional needs of inmates demanding kosher vegetarian meals. *Id.* at ¶ 51. DOCCS would have to bear the expense of purchasing items such as soy, increased legumes and other foods. *Id.* at ¶ 51.

According to Schattinger, in light of what DOCCS provides in its current menus, and the fact that there is no established dietary stricture requiring vegetarianism, DOCCS has determined that providing a kosher vegetarian meal plan would be exceedingly burdensome to staff and facility resources and is not financially feasible. *Id.* at ¶ 52.

## II. PROCEDURAL BACKGROUND

Plaintiff filed his Complaint and an application to proceed *in forma pauperis* on April 6, 2011. (Dkt. No. 1 and 2.) Plaintiff also filed the first of multiple motions for the appointment of counsel and injunctive relief, all of which, with the exception of pending motion for a preliminary injunction (Dkt. No. 124), have been denied.[16] (*see* Dkt. Nos. 4, 5, 10–11, 20, 22, 32, 56, 58, 60, 62, 67, 69, 73, 82, 87, 89, 92, 100, 103, 119–120.)

In reviewing Plaintiff's application to proceed *in forma pauperis,* the Hon. Norman A. Mordue, Senior D.J., noted that the three strikes rule of 28 U.S.C. § 1915(g) had been enforced against Plaintiff in the Northern District of New York. (Dkt. 11 at 3.) However, based upon Plaintiff's allegations that Defendants' ongoing refusal to provide him with "sufficient food to sustain him in good health in accordance with the dietary laws of the Nazarites faith" was causing him to suffer serious adverse health consequences, the Court made a preliminary finding that Plaintiff had sufficiently alleged "imminent danger" and allowed him to commence the action *in forma pauperis,* subject to revocation if, during the course of the litigation the Court concluded that Plaintiff did not face imminent danger of serious physical injury when he commenced the lawsuit, or was otherwise not entitled to proceed *in forma pauperis. Id.* at 5.

Defendants moved to dismiss Plaintiff's Complaint on *res judicata* and collateral estoppel grounds pursuant to Federal

Rule of Civil Procedure 12(b)(6) and pursuant to the three strike rule under 28 U.S.C. § 1915(g). (Dkt. No. 36.) This Court recommended denial of the motion (Dkt. No. 65), and the recommendation was adopted by Judge Mordue and the motion denied on February 20, 2013. [17] (Dkt. No. 66.) Defendants thereafter filed an Answer to the Complaint (Dkt. No. 70), and discovery ensued.

### III. APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc., Ml* U.S. 242, 251–52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, Ml* U.S. at 248.

**\*13** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [18] *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at \*3, 1999 U.S. Dist. LEXIS 16767 at \*8 (S.D.N.Y. Oct. 28, 1999) [19] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

### IV. ANALYSIS

#### A. Deficiencies in Plaintiff's Opposition Papers

Plaintiff failed to respond to the Statement of Material Facts filed by Defendants in the manner required under N.D.N.Y. L.R. 7.1(a)(3) in his opposition to Defendants' summary judgment motion. [20] His response is limited to "I hereby deny & Object to Each & Every Allegation Set Forth by the Defendants in Opposing My Claims Under *Williams v. Fischer Et. Al*–911–CV–379 As Either 'Untrue, Misleading & Vacuous.' (Dkt. No. 118 at ¶ 2.) While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se* ] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003).

**\*14** Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, [21] and (2) the nonmovant, if proceeding *pro se,* has been specifically advised of the possible consequences of failing to respond to the motion. [22] *See Champion, v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) (citation and internal quotation marks omitted). In deference

to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

**B. New Claims Raised by Plaintiff in his Opposition Papers**

Plaintiff was transferred to Great Meadow Correctional Facility ("Great Meadow") in December of 2013. (Dkt. No. 118–1 at 8.) Plaintiff's opposition to Defendants' summary judgment motion deals almost entirely with complaints about medical treatment and failure to accommodate his physical and hearing impairments at Great Meadow. (Dkt. No. 118–1 at 7–54, 59–66, 72–93.) [23] Plaintiff has also complained of the refusal to provide him with hot cereal and cup-a-soup and discontinuance of his CAD meals during Passover at Great Meadow, claiming that he is intentionally being starved. *Id.* at 11, 57–58, 68–70. Plaintiff contends that his transfer to Great Meadow, the lack of proper medical care and accommodations, and the refusal to give him hot water for his soup, are all in retaliation for his filing of grievances and lawsuits and for the sole purpose of causing him harm. *Id.* at 8, 12–13, 33. Plaintiff has alleged in his opposition papers that at Great Meadow he is being subjected to cruel and unusual punishment; discrimination on account of his race, color, and religion; deliberate indifference to his serious medical needs; and retaliation for filing grievances and lawsuits. *Id.* at 8.

A plaintiff cannot, as a general rule, raise new claims in papers in opposition to a motion for summary judgment. (Dkt. No. 22 at 4–5 .) *See, e.g., Shah v. Helen Hayes Hosp.,* 252 F. App'x 364, 366 (2d Cir.2007) (holding that the district court did not err in disregarding allegations the plaintiff raised for the first time in response to the defendant's motion for summary judgment); *Jones v. Fischer,* No. 9:10–cv–1331 (GLS/ATB), 2013 WL 5441353, at *15, n. 23, 2013 U.S. Dist. LEXIS 140318, at *47, n. 23 (N.D.N.Y. Sept. 27, 2013) ("Generally a party may not raise new claims in his or her response to a motion for summary judgment.") (collecting cases); *Beckman v. U.S. Postal Service,* 79 F.Supp.2d 394, 407–08 (S.D.N.Y.2000) ("Although a complaint need not correctly plead every legal theory supporting the claim, at the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.") (citations and internal quotation marks omitted); *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204,

219–20 (N.D.N.Y.2008) (in an action filed in November of 2005, where discovery had closed in December of 2006, the court concluded that new factual allegations raised by plaintiff in opposition to summary judgment motion should not be considered, where "the four new allegations [were] not made in response to a motion to dismiss (which typically occurs relatively early in an action, before discovery has occurred) ... [and] the net effect of permitting Plaintiff to so change the landscape of his claims at this late stage of the action would be to deprive Defendants of the fair notice envisioned by Fed.R.Civ.P. 8.").

**\*15** In light of the foregoing, and given that the newly raised claims regarding Plaintiff's medical care, failure to accommodate physical impairments, refusal to provide hot water for Plaintiff's cereal and cup-a-soup, and discontinuance of the CAD diet during Passover at Great Meadow, are not asserted against Defendants, the Court recommends that the District Court disregard the factual allegations and claims relating to Plaintiffs alleged transfer to, and treatment at, Great Meadows.

**C. Plaintiff's Official Capacity Claims For Money Damages Against Defendants Under 42 U.S.C. § 1983**

Plaintiff has asserted official capacity claims for money damages under 42 U.S.C. § 1983 against all of the Defendants. (Dkt. No. 1 at ¶ 140.) The Eleventh Amendment protects states against suits brought in federal court absent their consent or express waiver. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 92–100 (1984). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006)), and bars all money damages claims against state officials acting in their official capacities, including the Defendants herein. *Kentucky v. Graham,* 473 U.S. 159, 167–68 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against individual DOCCS employees sued in their official capacities are considered claims against New York and are thus barred by the state's Eleventh Amendment immunity).

Therefore, the Court recommends that Defendants be granted summary judgment dismissing Plaintiff's § 1983 claims for money damages against Defendants in their official capacity on Eleventh Amendment grounds. [24]

**D. Plaintiff's Claim for Money Damages under RLUIPA**

Plaintiff's Complaint has been construed to state a possible claim under RLUIPA. (Dkt. No. 11 at 2 n. 1.) RLUIPA provides that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. ¶ 2000cc–1(a) (2012).

In *Sossamon v. Texas,* —— U.S.——, 131 S.Ct. 1651 (2011), the Supreme Court held that RLUIPA does not authorize claims for money damages against state officials acting in their official capacities. After the commencement of this lawsuit, the Second Circuit, in *Washington v. Gonyea,* 731 F.3d 143, 144 (2d Cir.2013), held that RLUIPA does not create a private right of action against state officials in their individual capacity. Thus, Plaintiff cannot pursue claims for money damages against Defendants in their official capacities and has no claim against Defendants in their individual capacities under RLUIPA.

**\*16** Therefore, the Court recommends that Defendants' motion for summary judgment be granted as to Plaintiff's RLUIPA claim for money damages against Defendants in their official and individual capacities.

**E. Legal Standards for First Amendment Free Exercise and RLUIPA Claims**

**1.** *First Amendment*

It is well-established that prisoners do not forfeit all of their constitutional rights by reason of incarceration. *See Bell v. Wolfish,* 441 U.S. 520, 545 (1979). "In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier,* 417 U.S. 817, 822 (1974). Those rights include the right to free exercise of religion. *See O'Lone*

*v. Estate of Shabazz,* 482 U.S. 342, 348 (1987); *accord Moorish Science Temple of America, Inc. v. Smith,* 693 F.2d 987, 990 (2d Cir.1982) ("[A] prisoner retains those First Amendment guarantees, including the right to participate in practices which are an integral part of his religious faith ....").

The Second Circuit has held that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975). "Deny[ing] prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004). However, courts are reluctant to grant dietary requests "where the cost is prohibitive," or "the accommodation is administratively unfeasible." *Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990).

Because the free expression rights of prisoners must be balanced against the "interests of prison officials charged with complex duties arising from administration of the penal system," free exercise claims brought by inmates are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to infringements of fundamental constitutional rights." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (quoting *O'Lone,* 482 U.S. at 349). A prisoner's sincerely held religious beliefs must yield if they are contrary to prison regulations that are "reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89 (1987); *O'Lone,* 484 U.S. at 351–52 (Constitution does not require aprison to sacrifice legitimate penological objectives in order to satisfy an inmate's desire to exercise his religion as long as the inmate is not deprived of all forms of religious exercise); *Singh v. Goord,* 520 F.Supp.2d 487, 507 (S.D.N.Y.2007) ("Policies and practices which serve legitimate penological interests do not offend the Free Exercise clause.").

The Second Circuit recently examined the standard for analyzing a First Amendment freedom of religious expression claim in *Holland v.. Goord,* 758 F.3d 215, 220–21 (2d Cir.2014). In *Holland,* the court noted that it has yet to be decided in this Circuit whether, to state a First Amendment claim, "a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." (quoting *Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir.2006)). The court did not decide the issue in *Holland,* rather it assumed, without deciding, the continued validity of

the substantial burden test and analyzed the case accordingly. *Id.* The Court will follow *Holland.*

**\*17** If a substantial burden is found, courts must evaluate four factors set forth in *Turner* in determining if the regulation or governmental action are "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89. Those factors are: "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin,* 467 F.3d at 274 (citing *Turner,* 482 U.S. at 90–91).

When prison officials are able to state a legitimate penological interest to justify their actions, the burden shifts to the plaintiff to show that the defendants' concerns are "irrational." *Weathers v. Rock,* No. 9:12–CV–1301 (NAM/ATB), 2014 WL 4810309, at \*4, 2014 U.S. Dist. LEXIS 140422, at \*11–12 (N.D.N.Y. Sept. 23, 2014) (citing *Ford,* 352 F.3d at 595). "Given the difficult judgments attendant to prison operation ... a generally applicable policy even one that burdens an inmate's free exercise will not be held to violate a plaintiff's right to free exercise of religion if that policy is reasonably related to legitimate penological interests." *Holland,* 758 F.3d at 222 (citation and internal quotation marks omitted).

**2.** *RLUIPA*

While a plaintiff has no claim for money damages under RLUIPA, injunctive and declaratory relief are permitted against defendants in their official capacities. [25] *See Williams v. Leonard,* No. 9:11–CV–1158 (TJM/TWD), 2013 WL 5466191, at \*6, 2013 U.S. Dist. LEXIS 142051, at \*18–19 (N.D.N.Y. Sept. 30, 2013) (denying defendants' motion to dismiss inmate's RLUIPA claims for injunctive relief regarding family participation in a religious meal); *Singh,* 520 F.Supp.2d at 508 (allowing claim for declaratory judgment under RLUIPA to proceed to trial).

Under RLUIPA, Plaintiff has the burden of showing that his religious exercise is burdened and that the burden is substantial. *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010). The government may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthers

a compelling state interest and that it is the least restrictive means of furthering that interest. *Id.*

RLUIPA defines "religious exercise" to include "any exercise of religion whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A) (2000). A "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Singh,* 520 F.Supp.2d at 498 (citing, *inter alia, Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)).

**F. Analysis of Plaintiff's First Amendment Free Exercise and RLUIPA Claims**

**1.** *Personal Involvement in the Alleged Violation of Plaintiff's First Amendment Free Exercise and RLUIPA Rights*

**\*18** Defendants retired DOCCS Commissioner Fischer; DOCCS Director of the Inmate Grievance Program, Karen Bellamy; Upstate Superintendent D. Rock; Upstate Deputy Superintendent M. Lira; Upstate Chaplain Timothy Hawk; Upstate Food Administrator Don Haug; and Upstate Rabbi Friedman, all seek judgment dismissing Plaintiff's First Amendment claims against them on the grounds that they were not personally involved in the alleged violation of his right to free expression of his religious beliefs. (Dkt. No. 113–13 at 9–11.)

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior."* ). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at \*6, 2012 U.S. Dist. LEXIS 25367, at \*22–23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a

defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir.1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873. [26]

**a. Fischer**

Plaintiff wrote to Fischer on November 21, 2010, and January 14, 2011, alleging religious discrimination and requesting that he take action with regard to providing Plaintiff with a diet that accommodated his Nazarite religious beliefs. (Dkt. Nos. 1 at ¶¶ 80–83, 106–109; 113–10 at 24, 26–27.) Plaintiff claims that Fischer failed to take any effective action to protect Plaintiff's religious rights or ensure that he received a sufficiently nutritious alternate religious diet to sustain him in good health. (Dkt. No. 1 at ¶¶ 83, 109.)

**\*19** Fischer referred both of Plaintiffs letters to Perlman, under whose jurisdiction Ministerial Services fell. *Id.* at 23, 25; Dkt. No 113–10 at 1. Perlman responded to Plaintiff's letters on December 16, 2010, and February 7, 2011, respectively. (Dkt. No. 113–10 at 23, 25.) In his December 16, 2010, letter, Perlman disclosed that Fischer had referred Plaintiff's letter alleging religious discrimination to him for response. *Id.* at 25. Perlman recommended that Plaintiff contact Defendant Deputy Superintendent for Program Services at Upstate, M. Lira ("Lira"), regarding his discrimination concerns, and that in order to assist him in meeting his spiritual needs, Plaintiff write to his religious mentor and ask him to write directly to Ministerial Services to potentially become a volunteer. *Id.* In his February 7, 2011, letter to Plaintiff, Perlman indicated that Fischer had asked him to respond to Plaintiff's letter regarding a request for special dietary considerations particular to the vow of the Nazarite. *Id.* at 25. Perlman noted that the issue had been addressed several times, most recently in Perlman's letter of December 10, 2010, to which he referred Plaintiff. *Id.*

Perlman informed Plaintiff that the issue was considered closed. *Id.*

When asked about his claim against Fischer at his deposition, Plaintiff testified "[h]e just dealt with malfeasance and putting it off to somebody else. And then telling me, you know what I'm saying, that I have to deal with the religious advisor here and in Albany. I got to write to them. I you just putting it off." (Dkt. No. 113–3 at 97.) According to Plaintiff, Fischer failed to recognize his religion and passed it off to someone else. *Id.* at 98.

A supervisory official is not deemed to have been personally involved solely by virtue of referring a letter or complaint from a prisoner to the appropriate department for investigation. *See, e.g., Goris v. Breslin*, 402 F. App'x 582, 584 (2d Cir.2010) (affirming dismissal on summary judgment for lack of personal involvement where the deputy commissioner received letters from the plaintiff and forwarded them to others for investigation); *Rush v. Fischer*, 923 F.Supp.2d 545, 552 (S.D.N.Y.2013) ("[P]ersonal involvement has not been shown where a supervisor's only response to an inmate's complaint is to refer the complaint to the appropriate staff for investigation.") (citation and internal quotation marks omitted); *Josey v. Rock*, No. 9:11–CV–0028 (NAM/TWD), 2013 WL 1500435, at *11, 2013 US. Dist. LEXIS 51989, at *29 (N.D.N.Y. Mar. 19, 2013) ("A supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement.")

Accordingly, Fischer's referral of Plaintiffs letters to Perlman for handling does not constitute personal involvement under any of the *Colon* factors, and the Court recommends that Fischer be granted summary judgment on Plaintiff's First Amendment claim against him.

**b. Karen Bellamy**

**\*20** Defendant Karen Bellamy ("Bellamy") has been sued as Director of the DOCCS Inmate Grievance Program. (Dkt. No. 1 at 4.) Plaintiff has alleged in his Complaint that in October of 2010, he appealed to CORC from the denial of his appeal of an IGRC decision by Defendant Lira, as Acting Superintendent at Upstate. *Id.* at ¶ 67. According to Plaintiff, he "inform[ed] the DOCS grievance director that the Response from the Committee & the Acting Superintendent failed to Address the issues in his grievance and that Upstates (sic) policy was in Contravention of DOCS directive # 4202 And that the plaintiff was being starved which was affecting his overall health." *Id.* at ¶ 67.

Plaintiff has also alleged in his Complaint that on December 29, 2010, Bellamy rendered a decision reiterating the IGRC and Superintendent's reasons for denying Grievance No. UST–44053–10 and denying the appeal. According to Plaintiff, Bellamy categorized his faith as "Jewish" in the decision and made no attempt to investigate whether Plaintiff could be afforded a substitute for the foods he was prohibited from eating under his sect of the Jewish faith. *Id.* at ¶ 87 and 50.

Plaintiff also claims that Bellamy affirmed the actions of the other Defendants on his appeal from Defendant Upstate Superintendent D. Rock's ("Rock") January 10, 2011, denial of Grievance No. UST–44809–10, and a January 18, 2011, grievance complaining that he was passing blood and experiencing stomach pains due to the improper religious diet he was receiving. *Id.* at ¶¶ 101–102, 113.

All of Plaintiff's allegations against Bellamy deal with grievances appealed to, and decided by, CORC. There is no evidence in the record that Bellamy, as Director of the DOCCS Inmate Grievance Program, had any personal involvement whatsoever in the investigation, review, or determination by CORC of any of Plaintiff's grievance appeals. At most, the allegations in Plaintiff's Complaint regarding Bellamy, the memorandum from Bellamy simply acknowledging receipt of Plaintiff's Grievance No. UST–44053–10, *id.* at 49, and her signature, as Director, on CORC's determination denying Plaintiff's appeal on Grievance No. UST–44053, *id.* at 50, show that she was performing her administrative duties as Director. Therefore, the Court recommends that Bellamy be granted summary judgment on Plaintiff's First Amendment claim against her based upon her lack of personal involvement.

### c. Rock and Lira

In his Complaint, Plaintiff has alleged that he appealed an IGRC decision to Rock on October 20, 2010, and that on October 28, 2010, Lira, as Acting Superintendent, denied his appeal and suggested the RAM as an alternative to CAD, since DOCCS does not have a vegetarian CAD diet. (Dkt. No. 1 at ¶¶ 65–66 and 44.) Plaintiff has also alleged that he appealed the IGRC's denial of his December 9, 2010, grievance requesting hot cereal to Rock, and that Rock denied the appeal on January 10, 2011. *Id.* at ¶¶ 96, 101 and 51–54.

**\*21** Although there is some dispute among district courts in the Second Circuit, [27] a superintendent's mere affirmance of an IGRC denial of a grievance has generally been found insufficient to show personal involvement for purposes of liability under § 1983. *Keitt v. Schun,* No. 11–CV–438 (RTA/ JJM), 2014 WL 347053, at *8, 2014 U.S. Dist. LEXIS 184557, at *23–24 (W.D.N.Y. Jan. 30, 2014) (affirmance of denial of plaintiff's grievance is insufficient to establish personal involvement under § 1983); *Vogelfang v. Capra,* 889 F.Supp.2d 489, 503 (S.D.N.Y.2012); ("an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights."); *White v. Sears,* No. 9:10–CV–0721 (MAD/GHL), 2011 WL 2728443, at *8, 2011 U.S. Dist. LEXIS 74689, at *21 (N.D.N.Y. June 20, 2011) (merely denying a plaintiff's grievance is insufficient to establish personal involvement); *Hen ry v. Lempke,* 680 F.Supp.2d 461, 464 (W.D.N.Y.2010) (affirmance of denial of an inmate's grievances alone is insufficient to establish personal involvement).

The evidence in the summary judgment record reveals no personal involvement by Rock and Lira in the alleged non-recognition of Plaintiff's Nazarite Jewish faith, or DOCCS' alleged failure to accommodate his religious dietary restrictions. DOCCS Directive # 4202, provides that "[i]t should be clearly understood that [DOCCS] takes no position 'acknowledging any particular religion within its inmate population." (Dkt. No. 113–10 at 10.) The Directive places the responsibility on Ministerial Services to provide inmates spiritual assistance and provide such opportunities as are feasible for inmates to work with approved religious volunteers from the outside when an inmate's faith is not represented by a chaplain at his facility. [28] *Id.*

Furthermore, as explained in the Schattinger Declaration (Dkt. No. 113–8), menus are designed and implemented by the DOCCS Central Office Department of Nutritional Services, and absent an emergency, no facility level administrator, including the Superintendent and Deputy Superintendent, has the authority to alter or override the menus without prior approval of the Office of Nutritional Services, or to create menus of their choosing. *Id.* at ¶¶ 5–6, 11.) Thus, Rock and Lira were without authority to direct that Plaintiff be provided the diet he requested.

Therefore, the Court concludes that none of the *Colon* factors apply to Plaintiff's First Amendment free expression claims against Rock and Lira and recommends that they be granted

summary judgment on Plaintiff's First Amendment claims based upon their lack of personal involvement.

### d. Don Haug

Defendant Don Haug ("Haug"), is the Food Administrator at Upstate. (Dkt. No. 1 at 3.) Plaintiff claims that Haug denied his request to stop putting salmon on his tray. (Dkt. Nos. 1 at ¶¶ 44–45; 113–3 at 99–100; 113–4 at 28.) Inasmuch as the CAD meals were packaged at the FPC, and the Food Administrator at a correctional facility has no authority to alter or override the menus created by the DOCCS Central Office Department of Nutritional Services, or to create menus of his or her own choosing, (Dkt. No. 113–8 at ¶¶ 5–6, 11), Haug was without authority to comply with Plaintiff's request to alter the meals containing salmon or provide the diet Plaintiff claimed would that accommodate his Nazarite Jewish faith. Therefore, the Court recommends that Haug be granted summary judgment on Plaintiff's First Amendment claim based upon a lack of personal involvement.

### e. Timothy Hawk

**\*22** Timothy Hawk ("Hawk") was Chaplain at Upstate during the time period relevant to Plaintiff's Complaint. (Dkt. No. 1 at 3.) In his Complaint, Plaintiff alleges that on September 22 and 27, 2010, he wrote to Defendant Hawk explaining that Defendant Alston had advised him to contact the Upstate Chaplain regarding the procedures Plaintiff had to follow to have his Nazarite Jewish religion recognized by DOCCS. *Id.* at ¶¶ 57–58. Hawk sent Plaintiff a responsive memorandum on October 7, 2010, informing him that he had received his request for recognition of his religion by DOCCS, explaining the correct procedure to be followed, and directing Plaintiff to contact Defendant Morris because only Central Office could create a designation for a specific religious tradition. *Id.* at ¶ 68 and 45.

There is no evidence of Hawk's personal involvement in Plaintiff being denied a diet that he believed accommodated his Nazarite Jewish faith. Hawk was not authorized to alter or override the menus created by the DOCCS Central Office Department of Nutritional Services. (Dkt. No. 113–8 at ¶¶ 5–6, 11.) Furthermore, under Directive # 4202(C), the authority to identify particular faiths in the inmate population by DOCCS in an effort to accommodate the inmates' legitimate spiritual needs, resides in the first instance in Ministerial Services, to whom Hawk directed Plaintiff, rather than the facility Chaplain. (Dkt. No. 113–10 at 10.)

In light of the foregoing, the Court recommends that Defendant Hawk be granted summary judgment on Plaintiff's First Amendment claim based upon his lack of personal involvement.

### f. Rabbi Friedmann

Defendant Rabbi Friedmann was the Jewish Chaplain at Upstate during the time relevant to Plaintiff's First Amendment and RLUIPA claims. (Dkt. No. 113–4 at 59–60.) According to Plaintiff, Friedmann called him a "nigger" when Plaintiff rejected him as his Rabbi. (Dkt. No. 113–3 at 26.) A July 6, 2006, memorandum from Friedmann to the IGRC regarding Plaintiff's Grievance No. UST–27003–06, describes a meeting he had with Plaintiff on May 18, 2006, regarding a Change of Religious Designation Form, approved by Rabbi Feinberg, in which Plaintiff certified that he professed to be of the "Nazarite faith of the Orthodox Judaism Adhering to the Ancient Hebrew law. (Dkt. No. 113–4 at 60–62.) The memorandum also describes a letter dated May 15, 2006, from Plaintiff to Friedmann, that accompanied the Form, in which Plaintiff indicated he had sent Friedmann documents from Rabbi Feinberg on April 12, 2006, which Friedmann had sent back without acknowledgment, and had asked Friedmann when his rights as a Nazarite would be respected and he would be afforded his religious rights. *Id.*

In the memorandum, Rabbi Friedmann noted that if Rabbi Feinberg were an orthodox rabbi, he would not accept the "Nasserite" distinction as Judaism has not practiced it for approximately two-thousand years. *Id.* at 60. According to Friedmann, at the meeting, he informed Plaintiff that because Rabbi Feinberg was not a DOCCS chaplain, the Change of Religious Designation Form was not valid. *Id.* Friedmann denied using the "N Word" and denied being a racist, claiming that he had referred to Jewish practice according to Jewish law, and not to racial distinctions. *Id.* In a July 22, 2009, memorandum to IGRC regarding Plaintiff's Grievance No. UST–3971909, Friedmann noted that he had suggested to Plaintiff in the past that the RAM would solve most of his vegetarian problems. (Dkt. No. 113–4 at 59.) In a September 2, 2009, memorandum to Lira, Friedmann wrote that since Plaintiff had demanded three years ago that he have nothing to do with him as he was not his Rabbi, Friedmann had acceded to Plaintiff's request and had not seen him since July of 2006. *Id.* at 101.

**\*23** The evidence establishes that Rabbi Friedmann had no authority to override or alter menus or create menus of his own choosing. (Dkt. No. 113–8 at ¶¶ 6, 11.)

Furthermore, there is no evidence in the record suggesting that acknowledgment of Plaintiff's Nazarite sect of Judaism by Friedmann would have resulted in the desired changes in Plaintiff's diet. To the contrary, the Schattinger Declaration provides strong evidence it would not. (Dkt. No. 113–8.)

Because the evidence does reveal personal involvement by Friedmann with respect to the refusal to recognize Plaintiff's Nazarite Jewish religion, the Court recommends that summary judgment based upon lack of personal involvement be granted Friedmann only as to that part of Plaintiff's First Amendment claim regarding the failure to provide him with a diet that accommodated his Nazarite Jewish religious beliefs.

### g. Morris, Perlman, and Alston

Defendants Morris, Perlman, and Alston are not specifically seeking summary judgment based upon a lack of personal involvement in the alleged violation of Plaintiff's First Amendment free exercise rights, and the evidence establishes that they were personally involved in the alleged failure to recognize Plaintiff's Nazarite Jewish faith. However, the undisputed evidence in the Schattinger Declaration supports the conclusion that even if Plaintiff's Nazarite Jewish religion and the dietary restrictions it required had been acknowledged by Ministerial Services, the diet he seeks would not have been made available to him. (Dkt. No. 113–8 at ¶¶ 45–51.) Therefore, the Court recommends that, as with Friedmann, summary judgment based upon lack of personal involvement be granted Morris, Perlman, and Alston only as to that part of Plaintiff's First Amendment claim regarding the failure to provide him with a diet that accommodated his Nazarite Jewish religious beliefs.

### h. Conclusion

The Court recommends that Defendants Fisher, Bellamy, Rock, Lira, Haug, and Hawk be granted summary judgment on Plaintiff's entire First Amendment free exercise claim based upon a lack of personal involvement. The Court has also recommends that Defendants Friedmann, Morris, Perlman, and Alston be granted summary judgment as to that part of Plaintiff's First Amendment free exercise claim regarding the failure to accommodate is religious dietary requirements based upon a lack of personal involvement.

If the District Court were to adopt this Court's recommendations, the only remaining First Amendment free exercise claim remaining for consideration on the merits

would be Plaintiff's claim for the failure to recognize his Nazarite Jewish religion by Defendants Friedman, Morris, Perlman, and Alston. This Court will nonetheless consider whether, if personal involvement were found as to Plaintiff's entire First Amendment free exercise claim, Defendants would be entitled to summary judgment on the merits.

### 2. *Sincerity of Plaintiff's Religious Beliefs*

**\*24** In determining whether an inmate's religious beliefs are entitled to free exercise protection, "the relevant inquiry is not whether as an objective matter, the belief is 'accurate or logical.' " *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) (citing *Jolly,* 76 F.3d at 476). Rather, the inquiry is whether the plaintiff's beliefs are *"sincerely held* and whether they are, in his own scheme of things, religious." *Id.* (emphasis in original) (citation and internal quotation marks omitted). A sincerity analysis "seeks to determine an adherent's good faith in the expression of his religious belief." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984).

Recognizing that they are "singularly ill equipped to sit in judgment on the verity of an adherent's religious beliefs," courts have rejected an objective, content-based approach in favor of a more "subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." *Ford,* 352 F.3d at 588 (citations and internal quotation marks omitted). The Second Circuit has adopted an "expansive" definition of "religion" as "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." *Patrick,* 745 F.2d at 158 (quoting *United States v. Moon,* 718 F.2d 1210, 1227 (2d Cir.1983)) (quoting W. James, *The Varieties of Religious Experience* 31 (1910)).

The subjective test does not require that a plaintiff be a member of a particular religious organization. *Ford,* 352 F.3d at 589. *See also Jackson,* 196 F.3d at 321 (holding that the question of whether a plaintiff's beliefs are entitled to free exercise protection turns upon whether the beliefs were "sincerely held," not on the "ecclesiastical question" of whether the plaintiff was in fact a Jew under Judaic Law); *Ford,* 352 F.3d at 590–91 ("[T]he opinion of DOCS religious authorities cannot trump the plaintiff's sincere belief"). A court may not deny First Amendment protection simply because it finds that the inmate's sincere belief is "objectively incorrect" according to the tenets of his religion. *Ford,* 352 F.3d at 590–91.

Defendants do not appear to be challenging the sincerity of Plaintiffs religious beliefs for purposes of their summary judgment motion, questioning only whether his beliefs regarding the vow of the Nazarite are objectively correct. They have submitted the Declaration of Rabbi Potasnik who, while disagreeing with Plaintiff's beliefs as to what is required to abide by the vow of the Nazarite, has specifically acknowledged that he has no cause to question Plaintiff's sincere beliefs. (Dkt. No. 113–11 at ¶ 5.)

The evidence in the record is, in any event, sufficient for the Court to assume for purposes of this motion that Plaintiff's Nazarite religious beliefs are sincerely held and therefore entitled to protection under the First Amendment free exercise clause and RLUIPA. Plaintiff testified at his deposition that his parents and sister are Nazarites, as was his brother before his death. (Dkt. No. 113–3 at 30.) He also testified as to his clear understanding of the Nazarite vow as prohibiting him from eating or drinking anything from the vine, touching dead animals, and cutting his hair. (Dkt. No. 113–3 at 13–16.) According to Plaintiff, he initially took the Nazarite vow in 1986 and, after breaking the vow in 1996, took it again before entering prison, where he has continued to adhere to the vow, including the dietary restrictions imposed by the vow, throughout his incarceration. *Id.* at 30–31. In addition, Plaintiff appears to have been engaged in an ongoing effort to obtain recognition of his law of the Nazarite Jewish faith from DOCCS, as well as a diet that accommodates his religious beliefs, through correspondence and grievances since at least May of 2006. (Dkt. No. 113–4 at 62.)

### 3. *Substantial Burden*

**\*25** A substantial burden on sincerely held religious beliefs occurs when "the state puts substantial pressure on an adherent to modify his behavior and violate his beliefs." *Jolly,* 76 F.3d at 477 (internal quotation marks and alterations omitted). Plaintiff claims that his free exercise rights under the First Amendment and his rights under RLUIPA are being substantially burdened by Defendants failure to recognize his religion and provide him a nutritionally adequate diet accommodating his Nazarite Jewish beliefs.

An inmate who adheres to a minority religion must be given "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to the conventional religious precepts." *See Cruz v. Beto,* 405 U.S. 319, 322, n. 2 (1972). Reasonable opportunities, however, are not the same as identical treatment. As the Supreme Court explained in *Cruz,* ["w]e do not suggest ... that every religious

sect or group within a prison however few in number must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent or the demand." *Id.* at 322.

Plaintiff has not complained of the need for a special place of worship. Nor, in light of Plaintiff's expressed belief that the Nazarites in DOCCS are separate unto themselves, are not under rabbis or priests, and are teachers unto themselves (Dkt. No. 113–3 at 22, 27), have Plaintiff's religious beliefs been substantially burdened by the absence of a spiritual leader or opportunities for formal worship in accordance with Nazarite practices. Although Plaintiff expressed concern at his deposition that he may at some point in the future be required to cut his hair, there is no evidence in the record that has occurred. *Id.* at 12–14.

The Court does conclude, however, that the evidence supports a finding for purposes of this motion that DOCCS' failure to provide Plaintiff a diet that conforms with his understanding of his Nazarite vow, does substantially burden his sincerely held religious beliefs. Defendants contend that Plaintiff is not spiritually burdened by the lack of a vegetarian diet because under Jewish authorities' interpretation of the Nazarite vow, a person under the vow is not required to refrain from eating meat. (Dkt. No. 113–13 at 14.) However, what matters in the Court's analysis is whether Plaintiff's sincerely held belief that under the Nazarite vow he is not allowed to eat meat is substantially burdened, not whether Jewish authorities find his belief "objectively incorrect" according to the tenets of the Jewish faith. *Ford,* 352 F.3d at 590–91.

At his deposition, Plaintiff testified that he has been a vegan since he became incarcerated in the DOCCS system. (Dkt. No. 113–3 at 13.) The nutritionally adequate diet that Plaintiff claims necessary to accommodate his Nazarite Jewish religious beliefs, as well as his dairy allergy/intolerance, is one that does not include meat, fish, any food that comes from the grapevine, eggs, or dairy. (Dkt. No. 113–3 at 13–14, 23–24, 52, 87.) Plaintiff has rejected the suggestion of Rabbis Friedmann and Potasnik that he eat the RAM, which is almost entirely meat free, rather than the CAD, because it is not kosher. (Dkt. No. 1 at ¶¶ 133–34.) He has described the foods he believes should be substituted for the CAD as including "whole fruits[,] hot cooked vegetables[,] rice, beans, nuts, kosher cereals, peanut butter & jelly [,] juices or donuts." (Dkt. Nos. 5 at 2; 56 at 4.)

**4.** *First Amendment Free Exercise and RLUIPA Claims*

**\*26** Even assuming that Plaintiff's religious beliefs regarding his diet are sincerely held and substantially burdened, the Court concludes for the reasons explained below that the DOCCS' dietary policies and practices, which do not allow for the diet Plaintiff is seeking, are "reasonably related to legitimate penological interests," and for purposes of Plaintiff's RLUIPA claim, that the challenged policies and practices, as described in the Schattinger Declaration, further a compelling state interest and provide the least restrictive means of furthering that interest.

**a. Rational Connection of DOCCS Food Service Practices to a Legitimate Governmental Objective**

In *O'Lone,* the Supreme Court explained that under the first *Turner* factor, the Court accorded great deference to the judgments of prison officials "charged with the formidable task of running a prison." *O'Lone,* 482 U.S. at 353; *see also Shaw v. Murphy,* 532 U.S. 223, 230 (2001) ("[U]nder *Turner* and its predecessors, prison officials are to remain the primary arbiters of the problems that arise in prison management.").

Recently, in *Smith v. Perlman,* No. 9:11–cv–00020 (MAD/ CFH), 2014 WL 7333229, at \* 11, 2014 U.S. Dist. LEXIS 175341, at \* 34 (N.D .N.Y. Dec. 19, 2014), in which Defendants were granted summary judgment on Plaintiff's First Amendment/RLUIPA claim for a diet that conformed to both his therapeutic needs and religious beliefs, the District Court noted that "it is well established that DOCS has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups." (quoting *Majid v. Fischer,* No. 07–CV–4585, 2009 U.S. Dist. LEXIS 71616, at \*18–19 (S .D.N.Y. July 31, 2009)). In an earlier decision in *Hamilton v. Smith,* No. 9:06–CV00805, 2009 WL 3199520, at \* 4, 2009 U.S. Dist. LEXIS 91039, at \*13 (N.D.N.Y. Sept. 30, 2009)), Defendants were granted summary judgment on Plaintiffs First Amendment/RLUIPA claim regarding the failure to provide him a low sodium kosher diet. The District Court accepted the DOCCS defendants' argument that they had a "legitimate penological interest in carrying out their responsibility for daily preparation of meals for all inmates within their control," and that it was "not a reasonable demand that prison officials supply every inmate with their personal diet request for every meal." In *Tafari v. Brown,* No. 10–CV–1065 (GTS/DRH), 2012 WL 1085852, at \*19, 2012 U.S. Dist. LEXIS 45054, at \*57–58 (N.D.N.Y. Mar. 6, 2012), *report-recommendation adopted in part and rejected in part on other grounds,* 2012 WL 1098447, 2012 U.S. Dist. LEXIS 45055

(N.D.N.Y. Mar. 30, 2012), the Court found the same to be true where the plaintiff claimed that his religious beliefs required that he be provided with a kosher vegetarian diet, and the DOCCS defendants argued, as in this case, that "such a diet was extremely expensive and administratively burdensome and thus was not a feasible alternative." *Id.*

**\*27** The Schattinger Declaration (Dkt. No. 113–8) describes the additional employees and facilities that would be required, the logistical and administrative burdens, and the expense of preparing vegetarian kosher meals for transport to the fifty-eight individual DOCCS confinement facilities housing around 55,000 inmates. (Dkt. No. 113–8 at ¶¶ 8–9.) The Court finds Defendants have established that the DOCCS practice of providing standard menus, i.e ., the general confinement menu, the RAM, and the CAD to meet the dietary preferences and religious needs of inmates to the extent reasonably possible, has a rational connection to legitimate governmental objectives. The Court further finds that Plaintiff has failed to submit evidence showing that DOCCS' administrative and financial concerns are irrational.

**b. Alternative Means for Plaintiff to Exercise his Free Exercise Rights**

The second *Turner* factor also weighs in favor of Defendants. In *O'Lone,* the Supreme Court construed the second factor, whether a prisoner had alternative means to exercise his religious beliefs, as not whether the inmate had an alternative means of engaging in the particular religious practice at issue, but whether the inmate had been denied "all means of expression." *O'Lone,* 482 U.S. at 352. *See also Furnace v. Arceo,* No. C 06–4609 MMC (PR), 2008 WL 618907, at \*8, 2008 U.S. Dist. LEXIS 16172, at \*23 (N.D.Cal. Mar. 3, 2008) (noting that "the second *Turner* factor has been deemed satisfied where the prisoner retains 'the ability to participate in other significant rituals and ceremonies' of his faith, even if some aspects of religious practice are impinged upon") (citation and internal quotation marks omitted).

In *Tafari,* the court found that the second *Turner* factor weighed in favor of the defendants, who, as in this case, argued that the provision of a vegetarian kosher diet would be extremely expensive and administratively burdensome. *Tafari,* 2012 WL 1085852, at 15. The court noted that Tafari was able to practice his Jewish faith in that he was provided the kosher CAD meals three times a day, which complied with Tafari's religious tenets even though it was not the diet he felt would fully comply with his beliefs. *See also Hamilton,* 2009 WL 3199520, at\*5.

In this case, Plaintiff receives the CAD diet but claims that Nazarites are a sect of the Jewish religion which imposes dietary restrictions in addition to those imposed by a kosher diet. As in *Tafari,* while the CAD diet is not the diet that Plaintiff feels complies most fully with his beliefs, it is adequate in that it provides him a kosher diet. Furthermore, Plaintiff has what is likely the even better option of the RAM diet, which is almost entirely meatless and was recommended to him by Rabbi Friedmann as a way to solve most of his vegetarian problems. (Dkt. No. 113–4 at 59 .) In his Declaration, Rabbi Potasnik explains that fruits and vegetables are kosher unless infected with insects or worms that may not be eaten and notes that inmates whose religion prohibits them from eating meat or flesh can choose the meatless alternative. (Dkt. No. 113–11 at ¶ 13.) Potasnik points out that not all members of the Jewish faith follow strict kosher guidelines and some have opted for the alternative entree menu.

**\*28**  In addition to having adequate dietary alternatives, which although not perfect in Plaintiff's mind, have been shown to be adequate by his healthy weight and BMI and satisfactory nutritional state after many years on the CAD, Plaintiff has also been allowed to keep his hair long as required under his Nazarite vow. (Dkt. No. 113–3 at 72–73.) There is no evidence that suggests Plaintiff has been prevented from studying his faith, praying, or attending Jewish religious ceremonies and rituals. *See Hamilton,* 2009 WL 3199520, at *5.* The evidence does reveal that it was Plaintiff who decided that Rabbi Friedmann was not his Rabbi (before Friedmann allegedly called Plaintiff a racially derogatory name), and Plaintiff who claims that because he is his own religious teacher, he needs no spiritual leader. It is also Plaintiff who has not provided Ministerial Services with the identity of a living religious resource who could advise them of the requirements for a Nazarite Jew and how DOCCS could best accommodate the religion within the confines of a correctional institution, despite having been requested to do so. *Id.* at 22–23, 26–27; Dkt. Nos. 113–9 at ¶¶ 5–6; 113–10 at 10, 23, 29, 32.

### c. Impact on Guards, Inmates, and Prison Resources of Providing Plaintiff a Diet Accommodating his Religious Beliefs

The third *Turner* factor also militates in favor of Defendants. The evidence clearly establishes that making a kosher vegetarian diet available to inmates would have a detrimental financial and administrative impact on DOCCS. (Dkt. No.

113–8 at ¶¶ 45–52.) It would require the purchase of additional equipment for the FPC for creation of a dedicated kosher vegetarian production line and packaging for the meals, additional staff to run the line, and increased food costs. *Id.* "Even where the marginal cost and administrative burden of providing a specialized religious diet would be small or negligible, a rational nexus exists between a prison's dietary policies and its legitimate administrative and budgetary concerns." *Smith,* 2014 WL 7333229, at *12 (quoting *Hamilton,* 2009 WL 3199520, at *5)* (quoting *Arceo,* 2008 WL 618907, at *8).* In this case, the Schattinger Declaration establishes that the cost and administrative burden would be far greater than small or negligible.

In addition, the evidence reveals that even if DOCCS were to make a kosher vegetarian meal available to inmates as one of its standard meal choices, it would not satisfy Plaintiff's religious beliefs and dairy allergy/intolerance. Based upon the foods requested in his preliminary injunction motions and deposition testimony, Plaintiff would require a vegan diet prepared especially for him. [29] (Dkt. Nos. 5 at 2; 56 at 4; 113–3 at 13–14, 23–24, 52, 83.)

As in *Hamilton,* providing Plaintiff with a meal option outside of the established DOCCS-wide menus could have "a significant 'ripple effect' on fellow inmates, *Turner,* 482 U.S. at 90, in that such accommodation could open the door to the creation of various specialized menus for other inmates with different therapeutic and religious needs." *Hamilton,* 2009 WL 3199520, at *6.*

**\*29**  The Court finds nothing in the record showing that DOCCS position is unreasonable. *See Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995) ("The prisoner-plaintiff bears the burden of proving that the disputed regulation is unreasonable.").

### d. Alternative Means of Facilitating Plaintiff's Right that Have a De Minimis Effect on Valid Penological Interests

The fourth *Turner* factor requires the Court to consider the existence of alternative means of facilitating Plaintiff's right to a diet that accommodates his religious beliefs which impose only a de minimis effect on DOCCS' valid penological interests. The burden is on Plaintiff, rather than DOCCS officials, to show that there are "obvious, easy alternatives" to the established DOCCS-wide menu plan. *See O'Lone,* 482 U.S. at 350. Plaintiff has failed to put forth any alternative to the DOCCS-wide menu plan that would accommodate his

religious beliefs and dairy allergy/intolerance at a minimal cost or with minimal disruption of the administration and operation of the DOCCS food service. Plaintiff contends that the RAM does not meet his needs because it is not kosher (Dkt. No. 1 at ¶¶ 133–34). He claims that the CAD, which is kosher, does not meet his needs because it contains meat, fish, cheese, and grape products, and is nutritionally inadequate if he eats only those foods that are not prohibited and do not contain dairy. (Dkt. Nos. 1 at ¶¶ 43, 45–46, 88, 89, 137; 113–3 at 23–24, 52, 87; 113–3 at 14, 33, 36, 54–57, 60.)

Plaintiff testified at his deposition that DOCCS has an alternative diet where an inmate is given a substitute for something he is unable to eat for religious reasons, and suggested that he be provided with fruits, vegetables, rice, grains, peanut butter and jelly as substitutes for the foods he cannot eat in the CAD. (Dkt. 113–3 at 48–49.) That is essentially the diet Plaintiff has requested in his preliminary injunction motions. (Dkt. Nos. 5 at 2; 56 at 4.) However, Plaintiff has offered no evidence that DOCCS offers any such diet, and the Schattinger Declaration establishes that the only diets offered by DOCCS, aside from medically prescribed diets, are the general confinement diet, the RAM, the CAD, and the Green Haven program. (Dkt. No. 113–8.) The alternative means of meeting his religious dietary and dairy allergy or intolerance needs suggested by Plaintiff would be even more onerous than the kosher vegetarian diet DOCCS has found to be too administratively and financially burdensome to implement.[30] *Id.* at 45–51. Accordingly, the final *Turner* factor weighs in favor of Defendants as well.

### e. Compelling State Interest under RLUIPA

Plaintiff's Complaint has been construed by the Court as seeking a permanent mandatory injunction in the nature of the preliminary injunctions he has requested throughout the litigation regarding his diet. Defendants' lack of personal involvement in, and lack of authority with respect to Plaintiff's First Amendment free exercise claim regarding DOCCS' alleged failure to provide him with a nutritionally adequate diet satisfying his religious beliefs and dairy allergy/ intolerance, leads the Court to conclude that there is no Defendant in this action against whom effective injunctive relief could be awarded under RLUIPA.[31] Even if there were, for the reasons discussed herein, the Court finds that Defendants are entitled to summary judgment.

**\*30** "As a general matter, RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment."

*Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009). Nonetheless, the Supreme Court has observed that in enacting RLUIPA, Congress "anticipated that courts would apply the Act's [compelling state interest] standard with due deference to the experience and expertise of prison and jail administrators in establishing the regulations and procedures necessary to maintain good order, security, and discipline consistent with consideration of costs and limited resources." *Cutter v. Wilkinson,* 544 U.S. 709, 717 (2005).

The Court has found that Plaintiff's religious exercise has been substantially burdened by DOCCS' failure to provide him with a diet that accommodates his religious beliefs. The onus is therefore on Defendants to demonstrate that the challenged practices further a compelling governmental interest, and that the burden imposed is the least restrictive means of achieving that interest. *See Jova,* 582 F.3d at 415. Controlling costs and the administrative burdens placed on correctional facilities have been found to constitute compelling state interests under RLUIPA. *See, e.g., Vega v. Lantz,* No. 304CV1215DFM, 2009 WL 3157586, at \*8, 2009 U.S. Dist. LEXIS 88550, at \* 30 (D.Conn. Sept. 25, 2009) ("[T]he defendants have demonstrated ... that the regulation is in furtherance of compelling governmental interests including prison security, controlling costs, and maintaining workable administrative procedures."), *motion for reconsideration granted on other grounds,* 2012 WL 5831202, 2012 U.S. Dist. LEXIS 163963 (D.Conn. Nov. 16, 2012); *Phipps v. Morgan,* No, 04–CV–5108, 2006 WL 543896, at \*9, 2006 U.S. Dist. LEXIS 12198, at \* 20 (E.D.Wash. Mar. 6, 2006) ("The Court finds that Defendants have not only shown legitimate interest for First Amendment purposes, i.e., reducing costs, streamlining food production, limiting the number of required staff, maintaining consolidation of vendors, and limiting security risks, they have also established a compelling justification for the denial of Halal meals to Plaintiff under RLUIPA.").

The Court finds that Defendants have met the burden of showing that for financial and administrative reasons, DOCCS has a compelling state interest in limiting the number of menu options available to the inmates in the DOCCS system, even though that limitation has resulted in a kosher vegetarian diet being unavailable to those inmates whose religious beliefs require it. The Court also concludes, for the reasons articulated in the Schattinger Declaration (Dkt. No. 113–8), that limiting the number of different menus available to inmates on a DOCCS-wide basis, and restricting

individuals facilities' ability to alter those menus, satisfies the least restrictive means standard.

**5. *Conclusion***

For the foregoing reasons, the Court recommends that all of the Defendants be granted summary judgment on Plaintiff's First Amendment free exercise and RLUIPA claims.

**G. Eighth Amendment Claim for Cruel and Unusual Punishment**

 **\*31**  Plaintiff claims that as a result of Defendants' refusal to provide him with a nutritionally adequate diet that accommodates his religious beliefs, he has sustained significant weight loss, his health has dramatically declined, and his pre-existing illnesses are being exacerbated as his body is starved of the nutrients it needs. (Dkt. Nos. 1 at ¶ 137; 113–3 at 36.) Plaintiff claims that Defendants' refusal constitutes cruel and unusual punishment in violation of his Eighth Amendment rights. *Id.* at ¶ 136 and 6 and 9.

In addition to the absence of evidence in the record establishing the named Defendants' personal involvement in Plaintiffs diet and medical care, the medical evidence fails to support Plaintiff's Eighth Amendment claim. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain, or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102 (quoting *Trop v. Dulles,* 356 U.S. 86, 101 (1958)). Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (citation omitted).

Under the Eighth Amendment, prisons are required to provide for the basic human needs of inmates, including "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (per curiam) (citation and internal quotation marks omitted). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly,* 76

F.3d at 480 (citations omitted). "[A] prisoner may prevail only where he proves both an objective element that the prison officials' transgression was sufficiently serious and a subjective element that the officials acted, or omitted to act, with a sufficiently culpable state of mind, i.e., with deliberate indifference to inmate health or safety." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Farmer,* 511 U.S. at 834) (internal quotation marks omitted).

Under the objective test, no constitutional violation will be found as to restrictive diets unless the "diet was nutritionally inadequate, posed an imminent health risk, or physically injured the inmate." *McEachin,* 357 F.3d at 199–201. *See, e.g., Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (a deprivation of two of three meals per day for eight days created an issue of material fact sufficient for an Eighth Amendment claim to survive summary judgment); *Moss v. Ward,* 450 F.Supp. 591, 596–97 (W.D.N.Y.1978) (denial of food for four consecutive days and reduced food for three days thereafter sufficient to violate inmate's Eighth Amendment rights).

 **\*32**  Plaintiff's claim that he has sustained significant weight loss, his health has dramatically declined, and his pre-existing illnesses are being exacerbated as his body is starved of the nutrients it needs as a result of not being given the diet he demands is not supported by the medical evidence in the record. During the period from December of 2010 to March of 2013, while he was being given the CAD diet, Plaintiff's weight actually increased from 134 pounds on December 16, 2011, to 146 pounds on March 13, 2013. (Dkt. No. 113–7 at ¶¶ 13, 15.) During that time, Plaintiff's BMI has remained within the healthy range. *Id.* at ¶¶ 14, 16.

While Plaintiff's medical records reveal that he suffered from stomach pains for which he was given Alamag, [32] and blood in his stool, there is nothing in the records attributing those health problems to the failure to provide him with a nutritionally adequate diet that accommodates his religious beliefs and dairy allergy/intolerance. (Dkt. No. 115; *see also* Dkt. No. 113–4 at 8.) To the contrary, Plaintiff's medical progress notes for February 4 and 7, 2011, indicate that his kosher diet was not deemed to be a medical issue. (Dkt. No. 115 at 7, 9.) Plaintiff himself at one point blamed his digestive system problems on Crohn's disease, but in the late winter and early spring of 2011 refused to have a colonoscopy. *See id.* at 8–10.

Plaintiff filed Grievance No. UST–45070–11 on January 21, 2011, claiming that nothing was being done with regard to his stomach problems and passing blood. (Dkt. No. 113–4 at 5.) He also asked to see a dietician or be transferred to a facility that serves full kosher meals, not the CAD, so that he could get balanced meals. *Id.* In its unanimous denial of Plaintiffs appeal from denial of the grievance, CORC noted that Plaintiff had a colonoscopy on May 11, 2011, and was scheduled for a colorectal surgical consult in the near future. *Id.* at 3.

The record also fails to support Plaintiff's claim that he has worsening gum disease that had moved into his sinuses as a result of malnutrition, or that his spinal stenosis or other health problems are in any way related to his diet. *See* Dkt. No. 115. Furthermore, Karandy's April 28, 2014, examination of Plaintiff revealed him to be in good health with a weight and BMI in the healthy range and, along with the results of Plaintiff's blood work, consistent with appropriate nutrition. (Dkt. No. 113–3 at ¶¶ 9–11.)

Plaintiff's conclusory allegations of violation of his constitutional rights alone, without the support of competent medical evidence, are insufficient to establish a significant risk to his health necessary to defeat Defendants' motion for summary judgment on Plaintiff's Eight Amendment cruel and unusual punishment claim. *See Tafari,* 2012 WL 1085852, at *19 (citing *Llorente v.. Rozeff,* No. 99–CV–1799, 2001 WL 474261, at *3–4, 2001 U.S. Dist. LEXIS 5655, at *11 (N.D.N.Y. Apr. 12, 2001)* (plaintiff was required to present competent medical evidence of both the injury and the reaction to support a claim of deliberate indifference to a medical need). Accordingly, the Court recommends that Defendants' motion for summary judgment be granted as to Plaintiff's Eighth Amendment claim.

## H. Equal Protection Claim

 **\*33** Plaintiff contends that his rights to equal protection under the Fourteenth Amendment have also been violated by Defendants' refusal to provide him with a diet that accommodates the tenets of his faith. (Dkt. No. 1 at 8.) According to Plaintiff, he was the only Black Nazarite Jew at Upstate who complained that he was not receiving an adequate and nutritional kosher diet in accordance with the tenets of the Nazarite Jewish faith. (Dkt. No. 1 at ¶ 37.) Other Jewish inmates at Upstate and other DOCCS' facilities were provided the CAD, which contains meat, but Defendants refused to provide Plaintiff with an alternate diet accommodating his beliefs. (Dkt. No. 1 at ¶ 128.) Plaintiff

blames Defendants' failure to recognize his Nazarite Jewish faith and provide him with the alternate diet on discrimination based upon his race and religion. (Dkt. Nos. 1 at ¶¶ 36–37 and 39, 41, 56; 113–3 at 25–26, 69–70.)

The Equal Protection Clause directs state actors to treat similarly situated people alike. *City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "To prove a violation of the Equal Protection Clause, ... a plaintiff must demonstrate that he was treated differently from others similarly situated as result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn,* 505 U.S. 1, 10 (1992).

In the prison context, "the Supreme Court has specifically held that ... the Equal Protection clause does not require that 'every religious sect or group within a prison ... must have identical facilities or personnel.' " *Pugh v. Goord,* 571 F.Supp.2d 477, 502 (S.D.N.Y.2008) (quoting *Cruz v. Beto,* 405 U.S. 319, 322 n. 2 (1972). The *Turner* standard has been applied to equal protection claims by the Second Circuit, such that "even if plaintiffs can demonstrate that two groups are similarly situated disparate treatment may still be warranted if the government can demonstrate that the distinctions are 'reasonably related to legitimate penological interests.' " *Id.* (quoting *Benjamin,* 905 F.2d 572). This standard requires courts to "determine whether 'the groups are so similar that discretion has been abused.' " *Benjamin,* 905 F.2d at 575 (quoting *Jones v. North Carolina Prisoner's Labor Union, Inc.,* 433 U.S. 119, 136 (1977)).

In addition to the absence of evidence in the record establishing the named Defendants' personal involvement in Plaintiff's dietary requests, the evidence fails to support Plaintiff's claim that they violated his right to equal protection. The evidence supports the finding that the denial of the diet Plaintiff requested, while other Jewish inmates religious dietary requirements were met by the CAD, did not result from "intentional or purposeful discrimination" either on the basis of his race or religion.

 **\*34** Plaintiff's claim that he was discriminated against on account of his race is largely conclusory. Plaintiff's disputed allegation that Rabbi Friedmann called Plaintiff a "nigger" after Plaintiff rejected him as his Rabbi, is not sufficient to raise a material issue of fact as to racial discrimination

for purposes of Plaintiff's equal protection claim. "The law is clear that verbal harassment or even threats alone are not actionable under 42 U.S.C. § 1983." *Cotz v. Mastroeni,* 476 F.Supp.2d 332, 372 (S.D.N.Y.2007) (citing case law involving a corrections officer harassing an inmate by, *inter alia,* directing racial epithets at him and finding that such an action does not rise to the level of a constitutional violation).

Even if Plaintiff's allegations regarding Friedmann were enough to raise a factual issue regarding racial discrimination, there is no evidence in the record that Friedmann was personally involved in Plaintiff being denied the religious diet he has requested. In fact, the evidence shows that Friedmann had no authority to determine an inmate's religious diet (see Schattinger Declaration 113–8), except for the involvement, if any, he had in Ministerial Services making the determination that an inmate was Jewish and entitled to the CAD. *See* Directive # 4202(P). Likewise, there is no evidence that Plaintiff was denied the religious diet he requested by Friedmann or any of the other Defendants because of purposeful and intentional discrimination as a result of his Nazarite Jewish faith or because he is Black, but rather because of the policies and practices of DOCCS food service, which for financial and administrative reasons, do not allow for a personalized religious diet for each inmate.

In his Complaint, Plaintiff described himself as the "Only Black Nazarite Jewish Prisoner Confined at Upstate who has been Complaining About Not Receiving An Adequate & Nutritional Kosher diet in Accordance with the tenets of the Nazarite." (Dkt. No. 1 at ¶ 37.) The evidence shows that Plaintiff is not similarly situated to the significantly larger group of Jewish prisoners in the DOCCS system, whose religious beliefs are satisfied by the CAD diet.

Finally, even if Plaintiff could demonstrate that Black, or even all members of the Nazarite Jewish faith, as a group, are similarly situated to other Jewish inmates in DOCCS, as a group, the Court's analysis of the *Turner* factors with regard to Plaintiff's First Amendment free exercise claim, reveals that the disparate treatment complained of by Plaintiff is "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89.

The Court therefore recommends that Defendants motion for summary judgment be granted as to Plaintiff's equal protection claim.

## I. 42 U.S.C. §§ 1981, 1982, 1985 and 1986

Plaintiff has alleged in his Complaint that he has brought his claims for violation of his First, Fifth, Eighth and Fourteenth Amendment rights not only under 42 U.S.C. § 1983, but also pursuant to 42 U.S.C. §§ 1981, 1982, 1985, and 1986. (Dkt. No. 1 at 7.)

**\*35** Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a). To establish a claim under § 1981, a plaintiff must show that (1) he is a member of a protected class; (2) defendant intended to discriminate against plaintiff based upon his membership in the protected class; and (3) the discrimination concerned one or more of the activities enumerated in § 1981. *Brown v. City of Oneonta,* 221 F.3d 329, 339 (2d Cir.2000). Like the Equal Protection Clause, § 1981 can only be violated by purposeful discrimination. *Gen. Bldg. Contractor's Ass'n., Inc. v. Pennsylvania,* 458 U.S. 375, 391 (1982). Purposeful discrimination is "conduct motivated by a discriminatory purpose," rather than conduct that "merely result[s] in a disproportionate impact on a particular class." *Id.* at 386.

Where, as in this plaintiff does not put forward any claim under § 1981 that has not also been asserted under § 1983, the § 1981 claim is encompassed by the § 1983 claim, and they are analyzed together. *See Gladwin v. Pozzi,* 403 F. App'x 603 (2d Cir.2010). Because the Court has found that Plaintiff's § 1983 claims lack merit, so does Plaintiff's duplicative claim under § 1981. *See Howard v. City of New York,* No. 12 Civ. 933(JMF), 2014 WL 84357, at *2, 2014 U.S. Dist LEXIS 1015, at *23 (S.D.N.Y. Jan. 6, 2014).

42 U.S.C. § 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State ..., as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." The statute, by its clear terms, has no relevance to the claims asserted by Plaintiff in this action.

The elements of a claim under 42 U.S.C. § 1985(3) are "(1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, ... (3) an act in furtherance of a conspiracy, (4) whereby a person is ... deprived of any right of a citizen of the United States." *Brown,* 221 F.3d at 341 (citation and internal quotation marks omitted). The "conspiracy must also

be motivated by some racial or perhaps otherwise class based animus behind the conspirators' action." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 7 F.3d 1085, 1088 (2d Cir.1993) (per curiam) (citation and internal quotation marks omitted). The law is clear that conclusory, vague, or general allegations of conspiracy are not enough to sustain a claim under § 1985. *See Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993). In this case, the Complaint is devoid of factual allegations showing that any of the Defendants were involved in a conspiracy against Plaintiff, and there is no evidence in the record to support a conspiracy. Furthermore, the Court has concluded that Defendants have not denied Plaintiff's constitutional rights. Because Plaintiff's § 1985 claim fails, his claim under § 1986 fails as well. *See Brown,* 221 F.3d at 341.

**\*36** Given the foregoing, the Court recommends that Defendants be granted summary judgment dismissing Plaintiff's claims, if any, under 42 U.S.C. §§ 1981, 1982, 1985, and 1986.

## J. Qualified Immunity

Defendants contend that if the Court were to find that their actions violated Plaintiff's rights, they are entitled to qualified immunity. Inasmuch as the Court is recommending that Defendants be granted summary judgment based upon lack of personal involvement and/or on the merits, it finds it unnecessary to reach the qualified immunity argument.

## V. CONCLUSION

Based upon the foregoing, the Court recommends that Defendants motion for summary judgment be granted in its entirety. Inasmuch as the Court is recommending summary judgment in Defendants' favor, it also recommends that Defendants' request for revocation of Plaintiff's *in forma pauperis* status be denied as moot.

**ACCORDINGLY,** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 113) be ***GRANTED IN ITS ENTIRETY;*** and it is further

**RECOMMENDED** that Defendants' motion for the revocation of Plaintiff s *in forma pauperis* status under 28 U.S.C. § 1915(g) be ***DENIED ON MOOTNESS GROUNDS;*** and it is further

**ORDERED** that the Clerk's Office provide Plaintiff with copies of all unpublished decisions cited herein; and it is further

**ORDERED** that the Clerk's Office correct the civil docket in this matter to reflect the correct spelling of the names of Defendants Kenneth S. Perlman and Omega B. Alston.

Filed Jan. 15, 2015.

**All Citations**

Slip Copy, 2015 WL 1137644

## Footnotes

1    Plaintiff's Complaint also contains conclusory reference to 42 U.S.C. §§ 1981, 1982, 1985, and 1986. Defendants have addressed only Plaintiff's civil rights claims under § 1983. The Court has concluded, nonetheless, for reasons discussed below, that Defendants are entitled to judgment dismissing any claims Plaintiff may have intended to assert under §§ 1981, 1982, 1985, and 1986.
2    Plaintiff alleged violations of the Religious Freedom Restoration Act ("RFRA") in his Complaint. (Dkt. No. 1 at ¶ 7.) The District Court previously noted that the RFRA was invalidated by the Supreme Court in *City of Boerne v. Flores,* 521 U.S. 507 (1997) and, in deference to Plaintiff's *pro se* status, construed his Complaint as alleging a claim under RLUIPA, which was enacted by Congress to rectify the perceived infirmity of RFRA. *See Pugh v. Goord,* 571 F.Supp.2d 477, 504 n. 11 (2008). (Dkt. No. 11 at 2 n. 2.)
3    Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system.
4    Plaintiff testified at his deposition that he had not communicated with Rabbi Feinberg in a while and believes he has passed. (Dkt. No. 113–3 at 61); *see also* Dkt. No. 113–9 at ¶ 6 regarding Feinberg's passing. Plaintiff has not taken on a new spiritual leader since Feinberg's death. (Dkt. No. 113–3 at 94.)
5    In his Complaint, Plaintiff has alleged that Feinberg sent the letter in or about December of 2003. (Dkt. No. 1 at ¶ 41.) However, since the letter states that Plaintiff became a member of the Prison Yeshiva in October of 2004, it would not

have been sent before that date. Plaintiff appears to have sent a copy of the letter to Rabbi Friedman on April 12, 2006, indicating that the letter had been received at Upstate prior to that time. (Dkt. No. 113–4 at 60, 62.)

6    Feinberg used the exact same language in a letter written on behalf of the plaintiff inmate in *Perkins v. Booker,* No. 2:08– cv–97, 2009 WL 2058780, at \*10, 2009 U.S. Dist. LEXIS 64092, \*27–28 (W.D.Mich, N.D. May 29, 2009).

7    The Court takes judicial notice that DOCCS Directive # 4202 (Dkt. No. 113–10 at 10, *et seq.*), as revised 10/07/09, has now been superseded by DOCCS Directive # 4202, dated 07/24/14.

8    Clinton does not appear to have been as accommodating to Plaintiff's religious dietary restrictions as he now claims. In 2000, Plaintiff brought an unsuccessful civil rights action against the superintendent of Clinton arising in part out of Clinton's refusal to eliminate soy and soy products, milk and milk products, eggs, and fish from his diet and to provide him with a vegetarian diet to accommodate his Rastafarian religious beliefs. *See Williams v. Senkowski,* No. 9:00–CV– 1580 (TJM/DEP) (N.D.N.Y.) (*"S enkowski"* ). The Hon. David E. Peebles, M.J., recommended that the defendants be granted summary judgment on Plaintiff's claim that his First Amendment rights were violated by the defendants failure to accommodate his religious beliefs by providing him with a vegetarian diet. (*Senkowski,* Dkt. No. 66.) The Hon. Thomas J. McAvoy, Senior D.J., adopted Judge Peeble's Report–Recommendation in *Senkowski* and granted the defendants summary judgment. (*Senkowski,* Dkt. No. 68.)

9    Plaintiff filed a grievance in 2002 requesting a vegetarian diet. (Dkt. No. 113–4 at 65.) Denial of the grievance was upheld by the Central Office Review Committee after full investigation on the grounds that meals were provided in accordance with a state-wide menu, and DOCCS did not offer a vegetarian diet. *Id.* Grievance records from June of 2004 show that Plaintiff's religious designation at that time was Mohammedan. (Dkt. No. 113–4 at 66.) In a June 14, 2004, decision, the Central Office Review Committee denied Plaintiff's request for the CAD on the grounds that it was only available to those who proclaimed themselves to be Jewish. *Id.* at 66. Based upon the foregoing documentary evidence, it appears that Plaintiff did not begin receiving the CAD diet until some time in 2004.

10    Defendants have submitted the weekly CAD diet menu, which provides more detail regarding what is included in the meals. (Dkt. No. 113–5.) Defendants have also submitted the eight week general confinement menu which shows the meatless alternative entrees available to prisoners regardless of religious persuasion. (Dkt. Nos. 113–6; 113–9 at ¶ 7.)

11    While Plaintiff claims that he cannot eat the macaroni salad because it has vinegar, which may or may not be grape vinegar, in the mayonnaise, in his Grievance No. UST–45070–11, Plaintiff complained that he could not eat the macaroni salad because the mayonnaise made him pass blood. (Dkt. No. 113–4 at 5.)

12    The language of the decision is taken from the report of an investigation of the grievance which identifies Defendants Don Haug and Timothy Hawk as the investigative sources. (Dkt. No. 113–4 at 49.)

13    There is no evidentiary support in the record for Plaintiff's conclusory assertion that he was not properly weighed at Upstate. *See* Dkt. No. 133–3 at 37.

14    The Upstate messhall response in an investigation of one of Plaintiff's grievances over the failure to provide a diet that accommodated his religious believes, states that "[t]here are no substitutes for meat or fish unless it is medically indicated...." (Dkt. No. 113–4 at 14.)

15    Schattinger acknowledges that the inmate population includes vegetarians of varying degrees and vegans. *Id.* at ¶ 17. He includes as vegetarians inmates who eat fish and poultry but not red meat or pork and those who do not eat any type of animal flesh or eggs. *Id.*

16    Plaintiff has, on more than one occasion in this litigation, sought a mandatory injunction directing Defendants to provide him with a "sufficiently nutritional alternative kosher diet that conforms to plaintiff's religious dietary requirements." (Dkt. Nos. 5 at 2; 56 at 4.) Specifically, Plaintiff requested an order directing meal substitutes of "whole fruits[,] hot cooked vegetables[,] rice, beans, nuts, kosher cereals, peanut butter & jelly [,] juices or donuts" in lieu of the CAD he was currently receiving. *Id.* In its March 26, 2012, Decision and Order denying Plaintiff's first motion for a preliminary injunction, the District Court concluded that Plaintiff had failed to make the requisite "clear" or "substantial" showing of a likelihood of success on the merits on his First Amendment, RLUIPA, and Eighth Amendment inadequate medical care claims. (Dkt. No. 56.)

17    Defendants' motion pursuant to 28 U.S.C. § 1915(g) seeking conditional dismissal of Plaintiff's Complaint on the grounds that Plaintiff failed to satisfy the imminent harm exception to the three strike rule was denied without prejudice. (Dkt. No. 68.)

18    Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746).

19    Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

20    L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts. Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

21    L.R. 7.1(a)(3) provides that *"iThe Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* However, *see Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) ("[I]n determining whether the moving party has met its burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

22    Defendants have complied with L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 113–12.)

23    Plaintiff's complaints regarding his medical care and failure to provide accommodations for his physical impairments at Great Meadow relate generally to: (1) problems with his legs, including damage from a gun-shot wound to the knee; (Dkt. No. 118–1 at 7–11); (2) drop-foot and his need for a leg brace, *id.* at 10, 42, 76–79; (3) denial of physical therapy for his leg problems and reasonable accommodations such as being allowed to use the elevator, that he was given at Upstate, *id.* at 8–9, 30, 33–34, 69; (4) denial of appropriate pain medication for excruciating pain, *id.* at 9–11; (5) the prescribing of medications for worsening spinal stenosis with the sole intention of causing him harm, pain, and possibly death, *id.* at 8, 10, 51–55, 65; (5) vomiting blood, *id.* at 12; and (6) failure to provide the accommodations for his hearing impairment that were provided at Upstate. *Id.* at 8, 20–24, 60–61.

24    The Eleventh Amendment allows declaratory and prospective injunctive relief from violations of the Constitution and federal law. *See Edelman v. Jordan,* 415 U.S. 651, 677 (1974) ("federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief."); *see also Ex parte Young,* 209 U.S. 123 (1908) (Eleventh Amendment immunity does not preclude suits for injunctive and declaratory relief from continuing violations of federal law brought against state officers in their official capacities).

25    In his Complaint, Plaintiff requests a temporary restraining order and preliminary injunction compelling Defendants to provide him with a sufficient alternative religious diet. (Dkt. No. 1 at 8.) Although Plaintiff has not specifically requested permanent injunctive relief, the Court has liberally construed his *pro se* Complaint to seek permanent injunctive relief. Generally, when an inmate is transferred to another facility during the pendency of a lawsuit seeking injunctive relief, the request for injunctive relief is deemed moot. *See Shepherd v. Goord,* 662 F.3d 603, 610 (2d Cir.2011) ("in this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief.") (citation and internal quotation marks omitted). However, as pointed out in the Schattinger Declaration, inmate menus are controlled on a DOCCS-wide, not facility basis. Therefore, Plaintiff's claim for injunctive relief with respect to his diet are not mooted by his transfer to another facility in the DOCCS system. *See Pugh v. Goord,* 571 F.Supp.2d 477, 488 (S.D.N.Y.2008) ("there is an exception to the mootness doctrine for challenged actions that are 'capable of repetition, yet evading review.' " (quoting *Murphy v. Hunt,* 455 U.S. 478, 482 (1982)).

26    The Second Circuit has thus far found it unnecessary to decide whether *Iqbal* eliminated any of the *Colon* bases for liability. *See, e.g., Grullon v. City of New Haven,* 720 F.3d 133, 139 (2d Cir.2013).

27    *See, e.g., Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009) (finding that where the grievance involves an ongoing violation that can be directly remedied by the supervisory official affirming denial of the grievance, personal involvement can be found for purposes of § 1983).

28    The outside sponsor requirement has been upheld by the Second Circuit. *See Benjamin v. Coughlin,* 905 F.2d 571, 577 (2d Cir.1990).

29    According to Schattinger, DOCCS looked into the feasibility of providing additional or variant kosher programs after the implementation of the program at Green Haven and concluded that it would be extremely expensive and administratively burdensome. (Dkt. No. 113–8 at ¶¶ 43–44.)

30    Communications among DOCCS personnel, including Defendant Haug, as a part of the investigation of Plaintiff's grievances regarding the failure to provide him with a diet accommodating his religious beliefs, confirm Schattinger's statement that DOCCS does not have a kosher vegetarian meal and explain that no substitutions are made on the CAD unless an inmate has an allergy, that food allergies are handled on an individual basis, and substitutions, if approved, are only made with items already served on the CAD menu. (Dkt. No. 113–4 at 67–69, 71.) According to Haug, Plaintiff's

diet order had a milk allergy identified which required substitution of fruit for pudding and cream cheese and jelly with meat or eggs. *Id.* at 71.

31    Commissioner Fischer is retired, and as explained herein, even if his successor were substituted as a defendant, Plaintiff is not entitled to an award of injunctive relief under RLUIPA or any of his other claims.

32    Alamag is described as an antacid used to treat acid indigestion, heartburn, upset stomach, and sour stomach. *See* http:// dailymed.nlm.nih.gov/ dailymed/archives/fdaDrugInfo.cfm?archieved 40097, last viewed on 12/29/14.

---

**End of Document**                                                                 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3544879
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Richard WILLIAMS, Plaintiff,

v.

Mark LEONARD, Defendants.

No. 9:11–CV–1158.   |   Signed June 4, 2015.

**Attorneys and Law Firms**

Richard Williams, Comstock, NY, pro se.

Melissa A. Latino, New York State Attorney General, Albany, NY, for Defendant.

**DECISION & ORDER**

THOMAS J. McAVOY, District Judge.

**\*1** This *pro se* civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, was referred to the Hon. Thérèse Wiley Dancks, United States Magistrate Judge, for a ReportRecommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff alleges that the Defendants violated his right to free exercise of religion while incarcerated.

The Report–Recommendation, dated March 19, 2015, recommended that Defendants' motion for summary judgment be granted in part and denied in part.

The parties filed timely objections to the Report–Recommendation. When objections to a magistrate judge's Report–Recommendation are lodged, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiffs' objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Wiley Dancks for the reasons stated in the Report–Recommendation, with one exception. [1] Magistrate Judge Dancks recommends that the Court deny summary judgment on Plaintiffs RLUIPA claim "for injunctive relief and damages regarding the length of Plaintiffs pants" and Plaintiffs RLUIPA claim "for injunctive relief and damages regarding family participation in Eid el-Adha." "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord,* 758 F.3d 215, 224 (2d Cir.2014) (citing *Sossamon v. Texas,* —— U.S. ——, ——, 131 S.Ct. 1651, 1663, 179 L.Ed.2d 700 (2011)). Thus, to the extent that Plaintiff seeks monetary damages against the Defendants in their individual or official capacities under the RLUIPA, such damages are not available.

It is therefore

**ORDERED** that the parties' objections to the Report–Recommendation of Magistrate Jude Wiley Dancks, dkt.s 40, 41, are hereby OVERRULED in part. The Report–Recommendation, dkt. # 39, is hereby ADOPTED, except that the Court finds that Plaintiff may not obtain damages against the Defendants in their individual and/or official capacities under the RLUIPA. it is therefore ordered that Defendants' motion for summary judgment, dkt. # 33, is hereby GRANTED in part and DENIED in part, as follows:

1. The motion is GRANTED with respect to Plaintiff's Equal Protection Clause claim for injunctive relief regarding family participation in Eid el-Adha;

2. The motion is GRANTED with respect to any claims Plaintiff makes for damages against the Defendants in their individual and/or official capacities under the RLUIPA; and

**\*2** 3. The motion is DENIED in all other respects

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2015 WL 3544879

Footnotes

1    The Court notes that the Report–Recommendation contains one apparent typographical error. In discussing the Defendants' policies concerning hems on pants, the Magistrate Judge noted that the policy had been implemented in 2007 and amended in 2009 and 2013. *See* dkt. # 39 at 26–27. The Magistrate Judge found that the changes to the policy each permitted prisoners to hem their pants higher above their feet in an attempt to accommodate the religious practice at issue here. The Magistrate Judge noted that "[t]his suggests that Defendants were using the least restrictive means to further their interests between 2007 and 2013." *Id.* at 27. Since the Magistrate Judge recommended that the Defendants' motion be denied with respect to the RLUIPA claim, the Court assumes that the Magistrate Judge found that "Defendants were [*not* ] using the least restrictive means to further their interests between 2007 and 2013." The Magistrate Judge would otherwise have found that Defendants were entitled to summary judgment, and the Magistrate Judge clearly found otherwise. The Court agrees with the Magistrate Judge that questions of fact exist with respect to Plaintiff's claims regarding pant length under the RLUIPA.